## WOERHEIDE v. H. W. JOHNS–MANVILLE CO.

(District Court, S. D. New York. May 6, 1914.)

1. PATENTS (§ 101*)—CLAIMS—CERTAINTY.

Letters patent No. 973,902, for a cleat to secure prepared roofing in claims 2, 3, and 4, call for a cleat 'arched transversely" and having greater length than breadth, the crown of the arch being narrow, the side walls leading with "sufficient abruptness" from the narrow crown to the base of the cleat to prevent depression of the crown between the side walls, the ends of the cleat being closed by stay portions leading abruptly from the crown to the base of the cleat and connecting the side walls to resist outward movement thereof beneath the crown of the cleat, etc. *Held*, that the use of the words "sufficient abruptness" and "arched transversely" did not render the claims objectionable as vague and indefinite.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 141; Dec. Dig. § 101.*]

2. PATENTS (§ 328*)—VALIDITY—INFRINGEMENT.

Patent No. 973,902, for a cleat to secure prepared roofing, *held* to involve patentable invention, valid, and infringed.

In Equity. Suit by William H. Woerheide against H. W. Johns-Manville Company for infringement of letters patent No. 973,902, for a cleat to secure prepared roofing. Decree for complainant.

Charles. S. Champion, of New York City (Henry N. Paul, Jr., and Joseph C. Fraley, both of Philadelphia, Pa., of counsel), for complainant.

Odin Roberts, of Boston, Mass., and A. Parker Smith, of New York City, for defendant.

MAYER, District Judge. The sale of prepared roofings has increased extensively during the past 25 years. These roofings are shipped ready to be laid, and it has long been the usage of the trade to send with the rolls of roofing what are known as the "trimmings," i. e., the nails or other means of fastening. The familiar fastening means were flat-headed nails and tin caps with a nail in the center.

While there may be some difference of opinion as to the good and bad features· of these old-fashioned devices, it is plain that they were open to some serious practical objection.

Workmen, in some instances, mashed the tin caps so as to invert them, and, when the caps became inverted, the area of the binding pressure was substantially impaired. In the use. of the large-headed nails there was often left a considerable space of roofing between the nails upon which no pressure was exerted, and, as roofing fabrics of this character have a tendency to buckle, the buckling would frequently occur when the nails were driven hard. The liquid cement which went with this form of accessories and which was intended to cement the roofing sheets would sometimes in warm weather soften these sheets and in cold weather cause them to become springy or stiff. In short, while the old-fashioned method was fairly good, there was ample room for improvement.

Woerheide, who was a practical roofing man, realized the desirability of finding an improved method of fastening which would secure·

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a nearer approach to accuracy, careful handling, and firm holding. The result was the metal cleat which is the subject-matter of the patent. The device is simple and efficient.

It was the first practical and commercially availed of metal cleat for securing prepared roofings.

What little prior art was disclosed in the Patent Office constituted apt illustrations of how not to accomplish the result which was obviously attained by Woerheide. It is the old story of looking backward and seeing now how easy it was then. But patent cases sometimes are more than scientific discussions and have a good deal of flesh and blood in them.

The value of the Woerheide invention was seen at once by Mr. James of the Belknap Hardware Company of Louisville, Ky.—one of the large jobbers in roofing in this country. Mr. James appreciated that the Woerheide cleat was a great assistance in selling roofings, and so informed Mr. Wardell of the defendant company. Mr. Wardell is apparently an able up-to-date business man and, I think, can probably detect a good proposition in his line of business about as quick as any one. Mr. Wardell found from Mr. James that he could get a large order if he could supply a cleat similar to Woerheide's "Kant-Leak Kleet" and told Mr. James that "he would get up a cleat."

Mr. Wardell was able to work out the theory of the proposed cleat on the train returning to New York the night after his interview with Mr. James and, as a result, promptly produced the defendant's alleged infringing device.

When two alert business men like James and Wardell grasp, without hesitation, the commercial value of an article in their branch of business, that is convincing evidence of utility which would readily resolve a doubt as to patentability, if such existed. But I have no doubt on the question of invention because, in view of the state of the art, I think inventive ability was invoked to devise a metal cleat which would be strong, quickly and effectively nailed, and, generally speaking, easily handled.

[1] The next question is whether, from a technical standpoint, the claims are properly expressed. These claims are:

"2. A cleat arched transversely and having greater length than breadth, the crown of the arch being narrow, the side walls of the arch leading with sufficient abruptness from the narrow crown to the base of the cleat to prevent depression of the crown between the side walls, the ends of the cleat being closed by stay portions drawn from, and leading abruptly from, the crown to the base of the cleat and connecting the side walls to resist outward movement thereof beneath the crown of the cleat.

"3. A cleat arched transversely and having greater length than breadth, the crown of the arch being narrow, the side walls of the arch bending with sufficient abruptness from the narrow crown to the base of the cleat to prevent depression of the crown between the side walls, and the ends of the cleat being closed by stay portions restraining the side walls from spreading outwardly beneath said crown; the crown of said arch having therein, in alignment with each other longitudinally of the cleat a plurality of nail holes at the transverse center of the crown for a plurality of nails collectively of service in holding the cleat to its seat by direct action therefrom to and through said side walls.

"4. A cleat arched transversely and having greater length than breadth, the crown of the arch being narrow, the side walls of the arch leading with suf-

ficient abruptness from the narrow crown to the base of the cleat to prevent depression of the crown between the side walls, the ends of the cleat being closed by stay portions leading abruptly from the crown to the base of the cleat and connecting the side walls to resist outward movement thereof beneath the crown of the cleat; the crown of said arch having therein, in alignment with each other longitudinally of the cleat a plurality of nail holes at the transverse center of the crown for a plurality of nails collectively of service in holding the cleat to its seat by direct action therefrom to and through said side walls."

It is contended that such expressions as "sufficient abruptness" and "arched transversely" are vague and do not give that information to which the public are entitled.

[2] I cannot agree with this contention. It is a difficult, if not impossible, task to express "sufficient abruptness" and "arched transversely" in terms of mathematical accuracy. As Woerheide aptly pointed out, the necessary abruptness in a small device of this kind can only be ascertained by experience; and any one reading the specification and the claims ought not to have any trouble in understanding just what the claims comprehend. I think Mr. Wardell, for instance, did not encounter any difficulty on this score.

The real controversy in the case revolves around the question of infringement; for defendant claims that its cleat is the descendant of a mechanical ancestry different from that of the Woerheide.

This is not one of the cases where one, other than the patentee, worked out the problem independently; but, on the contrary, where, with the device of the patent in suit before him, he has attempted, if possible, to avoid the construction and claims of the patent. Of course, if he has succeeded, then the circumstances under which he undertook the creation of a new form of cleat become immaterial; but, on the other hand, he cannot escape infringement if his structure performs the same function as the patented structure in substantially the same way. An adequate understanding will be had if claim 3 is read on one of defendant's cleats, such as complainant's Exhibit 22.

There is much controversy as to the limitation of the phrase "arched transversely."

I am satisfied that defendant's cleat is arched transversely throughout its entire length in the sense of the patent, and that the duplication of the arch intermediate between the nailing points does not take the structure out of the claim in this respect. The crown of the arch of the patent is described as being "narrow." This is a structural limitation which is adequately explained in the specification (page 2, lines 53–64) as follows:

"The crown of the arch being practically no wider than the head of the nail being driven through it therefore presents no surface beyond the head of the nail for the face of a hammer to come into contact with when the blow is not accurately delivered, so that the impact of the blow is always caught by the head of the nail and the pressure distributed evenly throughout the cleat at the base flange. Missing the nail entirely, the hammer would be apt to hit, not the side, but the base flange."

A substantially similar construction is found in defendant's structure.

The main controversy, however, is as to the requirement as to "the side walls" of the arch leading with "sufficient abruptness" from the narrow crown between the "side walls." This definition is partly structural and partly functional. The purpose was to obtain a high degree of resistance so that force applied to the crown would be transmitted directly therefrom through the side walls to the object on which the cleat is laid. Defendant contends that its cleat is based on an entirely different principle, and that the Sherman patent for a nailing strip is the predecessor in principle of defendant's cleat; but such was evidently not Wardell's theory when he filed his application which resulted in patent No. 1,017,611. In that patent, referring to the corrugated edges, Wardell states, "This gives" the cleat "stiffness against bending strains" (page 1, line 59), and again:

"In operation the tacks or other fastening means are forced down until the dome-like portions 2, 2, are partly collapsed. This causes the elastic reaction of the metal to force the cleat down on the roofing with a uniform pressure, and to take up any inequalities in the thickness of the roofing material beneath it, due to wear or original unevenness. The roofing is firmly grasped by the ribs and crimped edges which form a plurality of gripping means on its under surface, and these also contribute greatly to the strength of the structure, without presenting any substantial obstruction to the flow of water over the cleats when in position on the roof. In short, the dome-like portions give strength in transmitting the pressure of the nails to the body of the strip and distributing the same over it, while the corrugated form of the strip produces a truss-like structure that transmits said pressure along from one dome-like portion to another without presenting any substantial obstruction on the roof's surface." (Lines 65 et seq.)

This point of view was stated in lay language in a small advertising pamphlet known as the "Blue Advertisement" issued by defendant in March, 1912.

I am not unmindful of the able discussion of Mr. Wadsworth, defendant's expert; but the most favorable view for defendant is that it has used equivalents, and, if regarded as equivalents, I think complainant's patent is entitled to at least the range disclosed in defendant's structure.

Finally, as to the Leslie patent, I may observe that on the evidence I think it is not a part of the prior art, and, even if it were, it is of no service from the standpoint either of anticipation or as a step in the prior art which would negative invention.

The defendant further insists that the words "the crown of the arch" limit the patent to a single arch, whereas "the arch" of the defendant's cleat is, in fact, many arches, and that in the cleat four domes appear, no one of which has a "narrow" crown. Defendant contends that six corrugations appear in the defendant's construction, and if they are arches they are plural and parallel so that the "crown of the arch" is an expression which cannot be stretched to cover several crowns of several arches, especially if these corrugated arches have no relation whatever to nails or nail heads or nail pressure, since no nails are driven through them and no nailing pressure directly sustained by them.

This, it seems to me, is entirely too limited an interpretation of the claims of complainant as applied to defendant's cleat. It is not neces-

sary to speculate as to what form of construction may avoid the language of the claims of the patent in suit; but, so far as concerns the particular controversy here, I am of opinion that defendant has infringed all three claims.

To be frank, I have returned to my first impressions, in regard to which I had some doubt, created largely, I think, because of Mr. Wadsworth's testimony; but a final analysis has convinced me that the case is one of clear infringement.

The complainant may have the usual decree, with costs.