EIBEL PROCESS CO. v. REMINGTON–MARTIN CO.

(Circuit Court of Appeals, Second Circuit. April 11, 1916.)

No. 205.

1. PATENTS ⬯328—VALIDITY AND INFRINGEMENT—FOURDRINIER MACHINE.

The Eibel patent, No. 845,224, for an improvement in Fourdrinier machines for making paper, was the first to instruct the art in a new principle of operation, applied by maintaining the breast roll at a substantial elevation above the guide roll, and by which a great economy is effected, was not anticipated by prior patents or prior use, and is not invalid for indefiniteness of the claim. Claims 1, 2, and 3 also *held* infringed.

2. PATENTS ⬯36—EVIDENCE OF INVENTION—COMMERCIAL SUCCESS.

Where there is doubt as to patentable novelty, the immediate commercial success of the patented machine in an old art should resolve the doubt in favor of the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 40; Dec. Dig. ⬯36.]

3. PATENTS ⬯165—VALIDITY—INDEFINITENESS OF DESCRIPTION.

Where the principle of operation of a patented machine is made clear, and the subject-matter is incapable of exact expression in terms of measurement, and a skilled worker in the art has no difficulty in following the directions of the patent, the claims will not be held invalid for indefiniteness because measurements are not given.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. ⬯165.]

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Northern District of New York.

Suit in equity by the Eibel Process Company against the Remington-Martin Company and others. Decree for defendants, and complainant appeals. Reversed.

For opinion below, see 226 Fed. 766. See, also, 197 Fed. 760.

The decree of the District Court dismissed a bill for infringement of patent to William Eibel, No. 845,224, dated February 26, 1907, covering an improvement in Fourdrinier machines for making paper. Claims 1, 2, 3, 7, 8, and 12 are in controversy.

F. P. Fish, Guy Cunningham, and Harrison F. Lyman, all of New York City, for appellant.

Crocker & Wickes, of New York City (F. L. Crocker, of New York City, of counsel), for appellees.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

MAYER, District Judge. The Fourdrinier machine has been known and used for over 100 years and has attained an efficiency beyond which it is difficult to advance. It is the machine universally employed for making all except a few special sorts of paper. In the following description we have adopted almost literally the language used by the expert, Arthur D. Little, in his admirably clear and concise exposition of the art.

The Fourdrinier is an aggregation of several sections, each composed of many parts, and each section performing a function which is in a sense independent, although for the production of a sheet of finished paper all these functions are interdependent and must be co-ordinated. The first section of the machine has for its function the actual formation of the web, which is later to be transformed into the finished paper, and it does this by distributing the wet stock as uniformly as possible upon an endless wire-cloth sieve, to which, as it travels forward, a sidewise motion or "shake" is imparted to insure the felting and interlocking of the fibers as they are deposited upon the wire by the drainage through the wire of the water in which they were suspended, and this portion of the machine is further supplied with mechanical devices, known as "suction boxes," over which the wire passes, and whose function is to compact the sheet by atmospheric pressure, which forces into the box considerable additional water not removable by drainage.

The next great division or section of the Fourdrinier machine has for its purpose the compacting of the wet sheet by mechanical pressure under rollers, and the compacted sheet then passes continuously to the third section of the machine, the function of which is to dry the sheet; the drying being effected by carrying the sheet over the surface of heated metal cylinders or dryers. The remaining sections of the Fourdrinier machine have for their object the "finishing" of the sheet by improving or smoothing its surface by means of heavy and highly polished steel rolls between which the sheet is passed.

It is primarily with the first section—that is, the sheet-forming section, known as the Fourdrinier part, or wet end, of the machine—that the Eibel process is concerned, which end of itself strictly, although not always popularly, speaking constitutes the Fourdrinier machine. This consists of:

(1) A flow box into which is pumped a constant supply of the paper-making stock, consisting usually of fibers of wet pulp with or without added mineral matter, the whole being mixed with from 135 to 200 times its weight of water, and having the appearance of diluted milk.

(2) An endless wire sieve woven with 60 or 70 meshes to the inch in common practice and often 75 feet long and 100 inches or more wide, the whole traveling rapidly over the breast roll, which runs on a horizontal axis at the flow box end of the machine, and the couch roll likewise running on a horizontal axis at the further end of the machine from the flow box.

(3) A supporting frame bearing a series of parallel horizontal rollers, called "table rolls," between the breast roll and the couch roll, upon which table rolls the top or active portion of the traveling endless wire sieve is supported, so as to present a plane, but not necessarily horizontal, surface for the reception of the stock.

(4) An opening connected with the flow box, called the "slice" opening, through which the mixture of fiber and water, called "stuff," or the "stock," flows onto the sieve in a stream the width of the desired sheet of paper. The stock is carried along on the sieve, draining off its water as it goes, until before the couch roll is reached at the further end of the wire the greater part of the water has drained away, and the paper in the form of a uniformly distributed wet pulp has sufficient strength to hold together and be carried through a series of pressing and drying rolls and calendars, from which it is rolled up as complete paper.

(5) Deckle straps, consisting of endless rubber bands of square or rectangular section, traveling at the speed of the wire, are placed at each side of the wire in contact with the top of the same. They are supported on wheels above the wire, so that their bottom side, which is in contact with the wire, runs along with it; the strap thus forming a wall which prevents the paper stock from running off at the sides of the wire.

(6) About 20 feet from the breast roll a series of suction boxes is placed beneath and in contact with the under surface of the wire. A partial vacuum is maintained within these boxes, so that through the agency of the atmospheric pressure upon the upper surface of the wet pulp a greater part of the water then remaining in the paper stock is forced out of the pulp into these boxes, so that very little free water remains in the wet web of paper after this has passed beyond the suction boxes.

These are the essential features of the Fourdrinier machine. It comprises in addition many supplementary details of construction and equipment. For instance, above the suction boxes, in contact with the surface of the paper is a skeleton roller, faced with wire cloth and called the "dandy roll," which gives to the upper surface of the paper

substantially the same texture as the surface in contact with the paper-making wire.

Under the wire from the breast roll to the suction boxes are shallow boxes or trays for receiving the water which runs through the wire sieve. This water contains a considerable amount of fiber and of mineral matter, provided clay or similar materials have been used for loading; and to prevent waste this water carrying these materials in suspension is caught by these "save-alls," as they are called, and pumped back again into the paper stock before it reaches the flow box.

The last roller for supporting the wire is larger than the others, and is called the guide roll, since it is equipped with a device for automatically varying the position of the axis of this roll as may be necessary to keep the wire running straight. After the wire goes over the guide roll it drops to the couch roll at a different angle.

In addition and very important is the "shake," namely, means for shaking the whole front end of the machine sidewise to promote the interlocking and felting of the fibers during the process of deposition by drainage. The motion of the shake is very rapid, say two or three times a second, and its amplitude may rarely amount to as much as one-half an inch.

Paper machines of the Fourdrinier type are very expensive, the cost of a news machine, independent of its housing, often reaching $100,000, so that, in order to earn a proper return upon this heavy investment, the paper maker is forced to utilize to the utmost the productive capacity of the machine. The machines are constantly operated day and night, and every endeavor is made to run them at the highest speed consistent with the quality of merchantable paper desired under the conditions imposed by the character and quality of stock and the limitations of the particular machine itself. The desirability of securing the maximum production is, of course, obvious in case of any sort of paper; but, where news paper is concerned, the low price of the product and the competition among the mills, with the resultant small margin of profit, make the question of output one of vital importance. With a given machine the total cost of labor and overhead charges, is approximately the same, whether the machine is producing 25 or 35 tons for 24 hours, so that, if a machine normally rated for say 25 tons can have its production increased to 35 tons, the additional 10 tons of paper thus gained is produced at little more than the cost of the materials entering into its composition.

In operating the machine, the paper stock in the flow box flows onto the paper-making wire at, or more commonly slightly beyond, the breast roll, the thickness of the stream flowing onto the wire being governed by a cross-bar extending across the entire width of the sheet of paper to be made, and at a height above the wire corresponding to the amount of stock which it is desired to flow upon the wire. This cross-bar is called the slice, and it holds back the stock from the wire, so that only a stream of the desired thickness can escape from the flow box out under the slice onto the wire. The supply of stock is so adjusted that the stock in the flow box behind the

slice extends some distance above the bottom of the slice, and there-fore the stock flows out onto the wire under the pressure of a hydraulic head, which may be varied within certain limits if the paper maker so desires. The original purpose of the slice was to keep the froth and chips, if any, upon the surface of the stock, from flowing onto the wire and causing breakage of the paper, with the loss of production incident thereto; but it has also the effect, in so far as it assists in the maintenance of a hydraulic head, of giving a substantial speed to the stock as it flows upon the wire. If the head in the flow box is, for example, 2¼ inches, the speed with which the stock at the bottom of the stream will flow to the wire will be substantially 200 feet per minute.

Accordingly, if the paper-making wire under these conditions is run at a speed not exceeding 200 feet, the wire has no work to do in the way of causing the stock to attain the speed of the wire, since the stock starts at that speed, and, although it is true that, even in that case, the wire performs the work of drawing along the stock, yet the work is slight, as the wire has no inertia of the stock to overcome, but only the friction of the air. If, however, the wire runs at 400 feet a minute, as was a common speed for news machines—that is, machines making news paper—at the time of Eibel's invention, then the making wire would be moving at a speed twice that of the stock coming onto the wire under a head of 2¼ inches, and the wire drawn out from under the paper stock, causing under these conditions waves and ripples, until the wire had by its friction given to the stock approximately the speed of the wire. Even when the stock starts at the exact speed of the wire, ripples always occur in the first portions of the flow on the wire of any machine running at any speed which even approximates 200 feet per minute. Many factors prevent an instantaneous quiescence of the sheet of stock, and the quantitative influence of each at the start is difficult to measure. Among these factors are the irregularities caused by the rush of water from under the slice, the variations between the speeds of the top and bottom of the sheet of stock, the effect of the shake, which is greatest near the breast roll, and the effect of the drainage of water through the wire, which is also greatest immediately after the stock comes upon the wire, and causes irregularities of flow.

Accordingly it is recognized by paper makers that the sheet is necessarily more or less rippled for several feet from the slice and any sheet smoothing out in that distance may be said to do so "at the start." As the machine is speeded up above 200 feet in case of machines with a horizontal wire, the wavy part extends further and further from the slice, and greater commotion is caused. This establishes a limit to the possible speed of the machine, for, while waves and ripples, if confined to the beginning of the wire, have substantially no effect on the sheet, because of the great fluidity of the stock at this point, and the fact that the sheet has hardly begun to form, yet if the disturbed condition is allowed to extend too far down the wire to a point where the viscosity of the stock is increasing so rapidly as to prevent readjustment after an initial disturbance,. the paper formed will be ir-

regular, because that formed at the crest of the waves will be thick, and at the hollows very thin, and the proper interlacing of the fibers will be disturbed or checked. At a further increased speed the paper, owing to these irregularities in structure, would break on the machine so often, causing so many delays and interruptions, that no gain in production would follow from the increased speed. Eibel recognized that the variation of speed between stock and wire was the chief cause of this long-extending commotion of the stock on the wire, which made the paper uneven in texture and strength, and caused breaks, and thus limited the increase in machine speeds, and this invention relates to the remedy.

[1] Eibel announced what he believed was a new principle of operation as follows:

"In accordance with my invention I operate entirely above the level to cause the stock to travel by gravity at a velocity approximately equal to the speed of the making wire, which I believe to be a new principle of operation."

He recognized and understood what had been done in the art in this respect up to his time, for in his specification he explained:

"The Fourdrinier wire has usually been arranged to move in a horizontal plane, although I am aware that means have been provided for adjusting the breast-roll end of the wire to different elevations, usually below the level, to provide for running with different grades of stock—as, for instance, with quick stock and slow stock; but so far as I am aware the making wire has always had to perform the work of drawing along the stock, and as the wire moved much faster than the stock the stock waved or rippled badly near the breast-roll end of the wire, which gradually diminished until an equilibrium was established and a smooth, even, and glassy surface presented, and not until the waving or rippling ceased did the fibers lay down uniformly and produce a well formed sheet of paper. The machine has been run necessarily at a low rate of speed to give ample time for the water to escape and for the fibers to lay down so as to make a uniform sheet, and in case the time was insufficient the breast-roll end of the wire has been lowered still farther until the desired result was accomplished."

The prior art showed instances where the pitch of the wire had been 2 or 3 inches and in two isolated cases up to 6 inches; but, as soon as the Eibel process became known, its principle was extensively adopted and applied so that to-day Eibel's process is the practice of the art. The testimony is that 2,600 tons of news paper are manufactured daily in the United States in accordance with the Eibel patent and the machines have been speeded up from an average of 400 to 450 feet per minute up to over 680 feet per minute; and that speed may, at any time, be exceeded, for the only limits which remain are certain practical factors such as strength of machine parts, drying capacity, and ability of the workmen in handling the paper. In short, the commercial success has been wide and pronounced in an art where time means money and increased production at practically no increased expense reflects itself in increased profits.

Among the tributes to the efficacy of the invention are the two infringing machines of defendant, in one of which the wire has a pitch of 18 inches from breast roll to guide roll, and in the other a pitch of 20 inches, enabling the speed to reach about 550 and 575 feet, respectively, per minute. We are satisfied from the evidence that Eibel

was the first to instruct the art in a new principle of operation, and we agree with the conclusions of the District Judge, when he pointed out succinctly what Eibel had accomplished:

"So far as I have been able to discover, no one claims to have discovered the advantages of having the wire carrying the stock and the stock move together at substantially the same speed, the stock impelled by gravity and directed by the wire, and to have embodied such idea and principle of operation in a patent, or an application for a patent, prior to the application by Eibel. This idea, so far as letters patent are concerned, appears to have been evolved by Eibel. It was urged * * * that it was not invention to ascertain and fix the degree of incline and ascertain by experiment the best method of paper making by means of a moving wire so adjusted. The rule is invoked that it is not invention to improve in degree merely on a principle of operation old in the art. This may be conceded, but I think Eibel discovered and practically disclosed much more than this. He not only elevated the breast-roll end of the paper-making wire, but regulated the speed at which the wire should move, making it move at equal speed with the stock, so that there is no obstruction to the natural flow of the stock under the influence of gravity and consequently no eddies and ripples and uneven laying down of the fibers."

The District Judge, however, held the patent void in view of the disclosures of previous patents and of prior uses, and intimated that the language of the claims was "indefinite" and "uncertain." These claims are as follows:

1. A Fourdrinier machine having the breast-roll end of the paper-making wire maintained at a *substantial* elevation above the level, whereby the stock is caused to travel by gravity, *rapidly*, in the direction of movement of the wire, and at a speed approximately equal to the speed of the wire, substantially as described.

2. A Fourdrinier machine having the breast-roll end of the paper-making wire maintained at a *high* elevation, whereby the stock is caused to travel by gravity *faster* than the normal speed of the wire for a certain grade of stock, and having means for increasing the speed of the machine to cause the wire to travel at substantially the same rate of speed as the *rapidly-moving* stock, substantially as described.

3. A Fourdrinier machine having the paper-making wire declined from the breast roll to the guide roll, the breast-roll end of the wire being maintained at a *substantial* elevation above the level, whereby the stock is caused to travel by gravity, *rapidly*, in the direction of movement of the wire and at a speed approximately equal to the speed of the wire, substantially as described.

7. A Fourdrinier machine having the paper-making wire declined from the breast roll to the guide roll, and the suction boxes supported at a corresponding declination, substantially as described.

8. A Fourdrinier machine having the paper-making wire declined from the breast roll, to the guide roll, and the several suction boxes arranged at different elevations, substantially as described.

12. In a Fourdrinier machine, a downwardly-moving paper-making wire, the declination and speed of which are so regulated that the velocity of the stock down the declining wire, caused by gravity, is so related to the velocity of the wire in the same direction that waves and ripples on the stock are substantially avoided and the fibers deposited with substantial uniformity on the wire, substantially as described.

We will now consider: (1) prior patents; (2) prior use; and (3) validity of the claims as drawn.

1. The Prior Patents. Six United States and ten foreign patents were received in evidence. All show means for effecting a slight ad-

justment of the breast roll, and none amounts to more than an illustration of the drainage adjustment which Eibel fully understood and referred to in his patent. The patents demonstrate that skilled men prior to Eibel did not appreciate the possibility of raising the breast-roll end of the machine more than an inch or two, and that none of them had the faintest conception of the principle of operation which characterizes the Eibel invention.

2. Prior Use. We think it is clearly established that no one of the alleged prior users had any understanding or appreciation of the Eibel principle. The question then remains whether as matter of fact the Eibel principle was operated, and whether, therefore, his contribution is merely an improvement representing an advance in degree.

Eight prior uses were testified to. Three of these (Rhinelander, Wis., Palmer Falls, N. Y., and Niagara Falls, N. Y.) do not merit discussion.

The use at Stockton, Cal., the latest date of which was 1892, must be regarded as an abandoned experiment and the pitch of 1½ inches as an unsuccessful temporary expedient. The highest speed attained was 250 feet per minute, and the regular speed 220 feet per minute.

Willamette Company, at Oregon City, Or. Here there were five machines, having pitches of 2 inches in some instances and 3 inches in others.

When the Eibel patent was issued, only two of these machines were carrying pitches, and the best speed was from 400 to 450 feet. On August 4, 1907, about five months after the issue of the Eibel patent, the wires were elevated on the various machines from 8 to over 20 inches, with a resultant increase of speed from 400 or 450 feet to from 500 to over 680 feet. Warner, a machine tender and presumably expert man, referring to conditions at the Willamette mill, said:

"We were continuously trying to form a better sheet, to make an increase in the speed that they were calling for. They wanted more speed, and at the same time they wanted as good a grade of paper. We puzzled our brains over the business to find a way to meet the requirements. * * * Our mill wasn't paying very well, and we were wild to increase our product, and trying all manner of schemes to increase the speed of the machines, that we might make some profit off the mills."

Nothing could be more convincing of the futility of a so-called use than the failure by expert practical men to accomplish a desired result and the discarding of an old method and the adoption of a new one immediately upon its advent.

Remington-Martin, at Norfolk, N. Y. When the Eibel patent was issued, the Remington-Martin machines were running flat; i. e., with horizontal wires. Shortly thereafter, high pitches were adopted.

Raymondville, at Raymondville, N. Y. There is testimony that one machine was running at a pitch of 3 inches in 1903, and that in October of that year an additional 3 inches was added, but the experiment was unsuccessful, for, as the superintendent testified:

"The machine tender had a lot of trouble, and when I asked what the matter was he said he thought, if I had raised the machine a little higher, it would not run at all."

The best proof of the failure of this effort is the fact that the production fell off.

Finally, Northern Paper Company, at Green Bay, Wis. The most that the evidence shows as to this use is that a pitch of not to exceed 6 inches was tried for two weeks or less and abandoned.

[2] Within the limits of an opinion it is not possible to analyze the testimony as to prior use in further detail. We think the evidence establishes that no one before Eibel had any knowledge of his theory, that, where not abandoned, the slight pitches were used, in most instances, to bring stock to the dandy roll more quickly than when the horizontal wire was used, thus giving it less time to drain, and causing it to reach the dandy roll in a more fluid condition; and, in any event, if there remained any doubt as to patentable novelty, that doubt would be resolved in this case in favor of the patent by commercial utility. Tilghman v. Proctor, 102 U. S. 707, 711, 26 L. Ed. 279; Hillard v. Fisher Book Typewriter Co., 159 Fed. 439, 441, 86 C. C. A. 469; Borgfeldt Stripping Machine Co. v. Universal Tobacco Machine Co., 215 Fed. 715, 132 C. C. A. 125.

3. Indefiniteness of Claims. It is urged that the use in claims 1, 2, and 3 of such words as "substantial elevation," "high elevation," and "rapidly" renders the claims void for indefiniteness and uncertainty. It is apparent that Eibel's invention is not susceptible of definition in terms of inches or feet per minute. As Little testified:

"The exact speed for any particular pitch was something which could not be accurately determined in advance, owing to the variations in stock used, paper desired, and construction of machines. Such determination is not, in fact, necessary. The grade is to be arranged to give a rapid gravity flow of the stock, and the machines then speeded up to meet it as long as the sheet remains smooth."

Any attempt to define lower and upper limits would have been an invitation to infringers. The practical workers in the art had no difficulty in understanding that the pitch must be higher than 3 or 4 inches, and that the pitch of the wire and the wire speed must be so correlated that gravity will accelerate the stock to speed equality with the wire.

[3] It is difficult to lay down a rule, and it is best to confine the test of indefiniteness to the facts of a particular case. Where, as here, the principle of operation is made clear, the pitch is substantially higher than that theretofore known in the art, a different result is accomplished, the subject-matter is incapable of exact expression in feet and inches, and the worker in the art has no difficulty in following the directions, then a claim using the phraseology of claims 1, 2, and 3 will not be held invalid. Any other construction might readily result in depriving a meritorious invention of its commercial value. Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 437, 22 Sup. Ct. 698, 46 L. Ed. 968; Woerheide v. H. W. Johns-Manville Co. (D. C.) 215 Fed. 604, affirmed 220 Fed. 674, 136 C. C. A. 316.

In this connection our attention is called by appellants to the opinion of the High Court of Justice, Chancery Division, in European Eibel Co., Ltd., v. Edward Lloyd, Ltd., reported in the Illustrated Official

Journal (Patents) Supplement, June 21, 1911, p. 349, and by appellants to the action of the German Patent Office. While the opinions of foreign courts may often be helpful, the record before us does not afford the means for an accurate comparison of the issues and proof which were before the English court and those here presented, and, indeed, there is enough to indicate that there were some differences. Haskell Golf Ball Co. v. Sporting Goods Sales Co. (D. C.) 210 Fed. 628. In patent cases especially, differences of opinion may readily arise because of the nature of the subject-matter. Mast, Foos & Co. v. Stover Co., 177 U. S. 488, 20 Sup. Ct. 708, 44 L. Ed. 856; Baldwin v. Abercrombie, 228 Fed. 895, —— C. C. A. ——.

As we conclude that claims 1, 2, and 3 are valid and infringed, we deem it unnecessary, for the purposes of this case, to pass on claims 7, 8, and 12.

The decree is reversed, with costs.