## EIBEL PROCESS CO. v. MINNESOTA & ONTARIO PAPER CO.

(District Court, D. Maine.   September 30, 1920.)

No. 769.

1. Patents ⬤⟳328—845,224, for improvement of Fourdrinier paper-making machine held not anticipated nor indefinite in claim; also held infringed as to claims 1-8, 12.

   The Eibel patent, No. 845,224, for improvement in Fourdrinier paper-making machine *held* not anticipated, and not invalid for indefiniteness of claim, and claims 1, 2, 3, 7, 8, and 12 *held* infringed.

2. Patents ⬤⟳45—Commercial utility resolves doubt as to patentable novelty in favor of patent.

   Where there is doubt as to patentable novelty, it may be resolved in favor of the patent by reason of its commercial utility.

In Equity. Suit by the Eibel Process Company against the Minnesota & Ontario Paper Company. Decree for plaintiff.

Fish, Richardson & Neave, of Boston, Mass., for plaintiff.

Livingston Gifford, of New York City, Nathan Heard, of Boston, Mass., Amasa C. Paul and Maurice M. Moore, both of Minneapolis, Minn., and Verrill, Hale, Booth & Ives, of Portland, Me., for defendant.

HALE, District Judge. This is a suit in equity to enjoin the infringement of United States letters patent to William Eibel, No. 845,224, dated February 26, 1907, for an improvement in Fourdrinier paper-making machines. The patent seeks to construct and arrange such machines, so that they may be run at a higher speed and produce a more uniform sheet of paper. For many years the Fourdrinier machine has been the best known and most widely used paper-making machine. In describing it, I follow substantially the plaintiff's details. It consists, primarily, of an endless wire-cloth sieve, or "wire," passed over a series of rolls at a constant speed. At the "breast roll" end, or wet end, of this wire there is discharged upon it from the "flow box," or "pond," a constant stream of paper-making stock, consisting generally of fibers of wood pulp, mixed with from 135 to 200 times their weight of water, and having the appearance of diluted milk. This sieve is woven with 60 or 70 meshes to the inch, and may be 75 feet long and 100 inches or more wide. As it travels forward, the fibers are deposited upon the wire, as the water drains out; the wire being given a sidewise thrust or "shake" to insure their proper felting and interlocking. The stock is carried along on the wire, draining off its water as it goes, until the "couch rolls" at the further end of the wire are reached. The stock is pressed between the "couch rolls," and then, in the form of a uniformly distributed wet pulp, is strong enough to hold together, and be carried through a series of pressing and drying rolls and calenders, which constitute the "dry end" of the machine. In order to aid in the extraction of the water from the pulp, there is placed, somewhere about 20 feet from the "breast roll," a series of "suction boxes" beneath

and in contact with the under surface of the wire. A partial vacuum is maintained within these boxes, so that the greater part of the water remaining in the paper stock is sucked out into the boxes, and very little free water remains in the wet web of paper after it has passed beyond this point.

There are many details of construction to which attention is called. The "flow box" is the box in which the stock is stored up, and from which it is discharged upon the moving wires, through the "slice," namely, the horizontal gate extending across the wire, by raising which the stock is discharged from the "flow box" upon the wire, in a stream having the width of the desired sheet of paper, and having a thickness dependent upon the height of the "slice" opening. The "deckle straps" are rubber bands, resting upon the wire at each side of the stream of pulp. They travel with the wire, so as to form lateral walls, to confine the stream of stock until it has reached a condition of such dryness that it no longer tends to flow. The "table rolls" are a series of parallel, horizontal rollers between the "breast roll" and the "couch roll," upon which the active portion of the wire is supported, so as to present a plane surface. The "dandy roll" is a roller, faced with the wire cloth, placed above the wire at a point beyond the first suction box and in contact with the upper surface of the paper. It imparts to the upper surface of the paper a texture similar to that which the lower surface receives from its contact with the wire. This "dandy roll" may also carry the design which impresses the watermark on the sheet, in case a watermark is desired. The last roller for supporting the wire is larger than the others, and is called a "guide roll," since it is equipped with a device for automatically varying the position of its axis, so as to guide the wire and keep it running straight. After the wire passes over the "guide roll," it drops at an angle below horizontal to the "couch roll." Fourdrinier machines are very expensive; and so for purpose of economy, they are operated day and night; and it is the constant endeavor of all paper manufacturers to run these machines at the utmost possible speed consistent with the production of good paper.

Prior to Eibel, as the proofs show, 450 feet of paper per minute was the substantial maximum at which good paper could be made. At speeds exceeding this limit, great commotion was caused in the stock on the wire, so that the paper formed was uneven, or "wild." It had waves, ripples, and wrinkles in it, during the critical period while the paper was forming, thus preventing an even formation. If higher speed was attempted, the sheet would sometimes break, stopping the machine.

The plaintiff says that Eibel made the discovery that the reason for this commotion of the stock, when high speeds were given to the wire, was the excessive difference of speed between the wire and the stock; and that such commotion could be avoided if the stock could be speeded up to equal the wire speed, at the point where active paper formation begins.

Eibel observed—so plaintiff alleges—that, so long as the actual difference between stock speed and wire speed did not exceed say 100 feet per minute, there was no great trouble, because the "drag" or

friction of the wire was sufficient to accelerate the stock to such an extent that speed equality and the consequent quiescence of stock was accomplished before the stock lost its fluid character. He saw the reason why "wild" paper was produced at high speed to be that there was too great a difference between stock speed and wire speed to be overcome by "drag," and that the under part of the liquid was dragged along faster than the upper part, thus causing waves and ripples. In order to meet these conditions, Eibel gave the wire "a sharp, downward pitch from the 'breast roll' to the 'guide roll'; and thus called in the aid of gravitation to speed up the stock on the wire, and to bring it up to speed equality with the wire"; his effort being to use gravity, in correlation with the other elements then in use, with the purpose of making the stock catch up with the speed of the wire. The plaintiff contends that the above is substantially Eibel's inventive thought. Translating that thought into a machine, he took the old Fourdrinier machine, and raised the "breast roll" end to a substantial elevation above the level. As a process, plaintiff says that Eibel's invention consists in giving a rapid flow of stock under the influence of gravity, due to a substantial wire pitch, and correlating this pitch with the speed of the wire in such a way that the initial difference of velocity between stock and wire is overcome under the influence of gravity, so that the waves and ripples, which would otherwise be present at the point of paper formation, are done away with; and plaintiff urges that Eibel had in mind the fact that small elevations of the wire had, up to that time, been used, but that these pitches were mainly for drainage requirements, and that no one had conceived the idea of applying a substantial elevation of the "breast roll" end of the wire to the purpose to which he applied it.

In his specification, Eibel calls attention to the prior art as follows:

"The Fourdrinier wire has usually been arranged to move in a horizontal plane, although I am aware that means have been provided for adjusting the breast roll and of the wire to different elevations, usually below the level, to provide for running with different grades of stock—as, for instance, with quick stock and slow stock; but so far as I am aware the making wire has always had to perform the work of drawing along the stock, and as the wire moved much faster than the stock, the stock waved or rippled badly near the breast roll end of the wire, which gradually diminished until an equilibrium was established, and a smooth, even, and glassy surface presented, and not until the waving or rippling ceased did the fibers lay down uniformly and produce a well-formed sheet of paper. The machine has been run necessarily at a slow rate of speed to give ample time for the water to escape and for the fibers to lay down, so as to make a uniform sheet, and in case the time was insufficient the breast roll end of the wire has been lowered still farther, until the desired result was accomplished. In accordance with my invention I operate entirely above the level to cause the stock to travel by gravity at a velocity approximately equal to the speed of the making wire, which I believe to be a new principle of operation."

He thus points out with some detail what his invention is:

"My invention is embodied, essentially, in the first part or element of the machine having the Fourdrinier wire, or paper-making wire, and consists in causing the stock to travel by gravity in the direction of movement of the making wire and approximately as fast as the making wire moves, there-

by resulting in a 'gravity feed' for the machine. The stock may be, and preferably is, caused to travel more rapidly than the normal or usual speed of the making wire for a certain grade of stock, and means are provided for increasing the speed of the machine, so as to cause the making wire to move at a higher rate of speed than usual, being substantially equal to the speed of the rapidly moving stock. To accomplish this result in a simple manner, the breast roll end of the paper-making wire is maintained at a substantial elevation above the level, thereby providing a continuous downwardly moving paper-making wire, and the declination thus given to the wire is such that the stock is caused to travel by gravity in the direction of the movement of the wire and substantially as fast as the wire moves. The declination of the paper-making wire may be adjustable, or the speed of the wire may be variable, or both the declination and speed of the wire may be adjustable, in order that the velocity produced by gravity in the stock on the declining wire will approximately equal the speed of the wire. By this arrangement the speed of the machine may be increased to such an extent as to bring the speed of the making wire up to the maximum velocity of the rapidly moving stock, and a strong, even, and well-formed sheet produced, which is more uniform than usual. * * *

"The elevation above the level at which the breast roll end of the making wire is maintained will vary according to the grade of stock; but in any event it will be substantial, so as to cause the stock to move rapidly by gravity. * * * For the purpose of increasing the speed of the machine to the maximum, I maintain the breast roll end of the making wire at a high elevation above the level so that the stock travels by gravity much faster than the making wire ordinarily runs for a certain grade of stock, and I then increase the speed of the machine to such extent as to bring the rate of speed of the paper-making wire up to the speed of the rapidly moving stock, and as a result the capacity of the machine is largely increased.

"I find in practice that, by providing a gravity feed operating substantially as herein described, the stock runs smoothly and evenly, without waving or rippling, and the fibers are thereby permitted to settle with great uniformity, as regards their distribution over the wire, so that the paper, in addition to being well formed, is very uniform. Furthermore, as the stock is moving with the paper-making wire, instead of being moved by the wire, or essentially by the wire, the formation of the paper will begin at the start and will continue to the end of the travel of the stock with the wire. Furthermore, by making the sheet of paper uniform over all less sulphite or strengthening material is required. Furthermore, as the stock carries less water when arriving at the suction boxes, the amount of suction ordinarily required may be reduced, thereby reducing the friction due to the making wire passing over the suction boxes, and hence increasing the life of the wire. * * *"

The claims of Eibel's patent now at issue in this suit are claims 1, 2, 3, 7, 8, and 12, as follows:

"1. A Fourdrinier machine having the breast roll end of the paper-making wire maintained at a substantial elevation above the level, whereby the stock is caused to travel by gravity, rapidly, in the direction of the movement of the wire, and at a speed approximately equal to the speed of the wire, substantially as described.

"2. A Fourdrinier machine having the breast roll end of the paper-making wire maintained at a high elevation, whereby the stock is caused to travel by gravity faster than the normal speed of the wire for a certain grade of stock, and having means for increasing the speed of the machine to cause the wire to travel at substantially the same rate of speed as the rapidly moving stock, substantially as described.

"3. A Fourdrinier machine having the paper-making wire declined from the breast roll to the guide roll, the breast roll end of the wire being maintained at a substantial elevation above the level, whereby the stock is caused to travel by gravity, rapidly, in the direction of movement of the wire and

at a speed approximately equal to the speed of the wire, substantially as described.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"7. A. Fourdrinier machine having the paper-making wire declined from the breast roll to the guide roll, and the suction boxes supported at a corresponding declination, substantially as described.

"8. A Fourdrinier machine having the paper-making wire declined from the breast roll to the guide roll, and the several suction boxes arranged at different elevations, substantially as described.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"12. In a Fourdrinier machine, a downwardly-moving paper-making wire, the declination and speed of which are so regulated that the velocity of the stock down the declining wire, caused by gravity, is so related to the velocity of the wire in the same direction that waves and ripples on the stock are substantially avoided and the fibers deposited with substantial uniformity on the wire, substantially as described."

The defenses are: First, invalidity of the patent by reason of anticipation in the prior art, and by reason of indefiniteness in some of the claims; second, noninfringement.

The patent has been before the Court of Appeals in the Second Circuit. Eibel Process Co. v. Remington-Martin & Co. et al., 234 Fed. 624, 148 C. C. A. 390. The court held the patent to be valid and infringed as to claims 1, 2, and 3.

[1] 1. The defendant contends that there has been anticipation in the prior patented arts, and also that there has been actual prior use of the Eibel invention. In introduces testimony tending to show that there were certain patents disclosing a substantial pitch, both for drainage purposes and for the same purposes to which Eibel applied the "gravity feed" system.

In the Remington-Martin Case, 234 Fed. 624, 631, 148 C. C. A. 390, 397, the court examined certain prior patents introduced by the defendant as proving anticipation. As to these patents the court said:

"Six United States and ten foreign patents were received in evidence. All show means for effecting a slight adjustment of the breast roll, and none amounts to more than an illustration of the drainage adjustment which Eibel fully understood and referred to in his patent. The patents demonstrate that skilled men prior to Eibel did not appreciate the possibility of raising the breast roll end of the machine more than an inch or two, and that none of them had had the faintest conception of the principle of operation which characterized the Eibel invention."

The same patents are before me in this case. Upon examination of them, I find no reason to differ from the conclusion of the Court of Appeals in the Second Circuit. The defendant now refers to the Barrett & Horne patent, No. 691,333. This is said to be an improvement on an earlier Barrett & Horne patent, No. 634,288, which was in evidence in the Remington-Martin Case. The later patent refers to the former patent and says:

"It is the object of our present invention to modify this type of machine by placing the adjusting device for the shake frame above the same and out of reach of any moisture or water that might flow over onto the floor."

The purpose of the adjustment appears to be the same as in the earlier patent, namely, "to adapt the machine for pulp of different kinds

or grades." In the earlier patent the method of so adapting the machine for pulp of different kinds is explained as follows:

"In certain kinds of pulp, notably the wood pulp which is now largely used in making paper, the water drains away very rapidly, so that the pulp may become nearly dry before it leaves the shake frame, and thus not be properly laid when it reaches the rollers. This tendency may be obviated to a considerable extent by downwardly inclining the shake frame toward the rollers, so that the water tends to travel along with the pulp, and will not, therefore, drain out through the wire so rapidly. It is further desirable that the amount of inclination or slope should be variable, so as to adapt the machine for pulp of different kinds or grades."

It appears, then, that the reason for the slight pitch of the wire which these patents provide is to prevent the difficulty arising when certain kinds of pulp are used, in which the water drains away rapidly. In the later patents, as in the earlier one, I find no claim of any novelty in respect to an effort toward adjustment, for the purpose which Eibel disclosed. The patents tend, rather, to illustrate adjustments well known to the whole art before Eibel, and referred to at lines 82 et seq. of his specification. They do not disclose that these adjustments are for the Eibel purpose of reducing the relative speed of stock and wire, giving the stock a gravity acceleration, and thus doing away with the waves, ripples, and wrinkles caused by the difference of speed between the stock and the wire. There is no indication that the patents seek to increase the speed of production. I think this may also be said of the alleged prior use at Lisbon Falls. This relates to two machines of the Pejepscot Paper Company. There was a pitch of 2 inches used on these machines before the Eibel patent. This use was clearly for "carrying the water nearer to the suction box."

Evidence was offered by the defendant tending to show a pitch of 4 inches or more, and that such pitch was used for purposes which might be held to be within the Eibel patent. After examining this testimony, I find it insufficient to establish either the date or other substantial facts with reference to this alleged prior use. This is especially so in view of the well-known rule invoked by Judge Putnam of the Court of Appeals in this circuit, in the Emerson and Norris Case, 202 Fed. 747, 750, 121 C. C. A. 113. After a careful study of all the evidence offered by the defendant to prove anticipation, either in patents or by a prior use, I am led to the conclusion that no one of the prior inventors, or alleged users, disclose any of the inventive purpose of Eibel. No one shows any knowledge of any relation between the pitch of the wire and speed, or of the use of gravity to aid the other elements in well-known use before Eibel. From a study of the proofs now before me, I see no reason to differ with the Court of Appeals in the Second Circuit in its conclusion that no one before Eibel had any knowledge of his theory; and that the slight pitches of the prior art were used in most instances to bring stock to the "dandy roll" more quickly than when the horizontal wire was used.

It is true, of course, that a slight pitch of two inches causes some slight increase in the speed of the stock on the wire. Eibel's claims are limited to a substantial pitch, for it is only by such assistance of gravity that Eibel could acquire the speed which he sought. He ap-

pears to have been invoking this aid of gravity, in correlation with the conditions which he already found in the use of Fourdrinier machines, namely, "drag" and "head."

It is evident that the trivial pitches in the prior art were used for a wholly different purpose from that of Eibel. Those who used them are not shown by the proofs to have appreciated and observed the operative system which Eibel invoked. Their use was so inconsiderable in extent that any possible effect was apparently too small to be capable of observation. They would give no help to any one seeking to obtain further speed in the use of the Fourdrinier paper machine. They would give no hint in regard to any practical purpose of conforming the speed of the stock to the speed of the wire. If, in using the pitch for drainage, some slight advantage was obtained in reference to equalizing the speed of the stock to that of the wire, it was clearly an unexpected and unappreciated result. And it is clear that such result is not sufficient to constitute infringement. Tilghman v. Proctor, 102 U. S. 707, 711, 26 L. Ed. 279.

[2] If there be any doubt as to patentable novelty, this doubt may well be resolved in favor of the patent, by its commercial utility. The proofs show that, when the Eibel process was first put in use at Rhinelander, the high pitch which Eibel had brought to the art was looked upon as revolutionary. Up to that time the usual speed of Fourdrinier machines had seldom exceeded 450 feet per minute, although the whole art was seeking greater speed. It was said that the "fastest machines in the world" had arrived at a speed of about 500 feet per minute; but to attempt to get an increase of speed beyond this limit had met with failure, and where high speed had been tried it had been abandoned, because it was found that at higher speed there was great commotion on the wire, resulting in "wild" paper. After the Eibel idea got fairly before the public, it was at once adopted by substantially the whole art. As a result of using the high pitch, taught by Eibel, the proofs show that the paper machines have been able to increase their speed from 25 to 30 per cent., or even more; so that it is now the common practice to make newspaper at a speed of 600 feet, or even 680 feet, per minute, and that it is not now known what the limit may be to speed.

In Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177, the Supreme Court found a new and useful result where a loom was made to produce 50 yards a day, when it had never produced more than 40. The teaching of that case has now become common learning in courts accustomed to pass upon patents. Success makes the result seem simple; and it is quite usual to have witnesses say that the thing was easy, and did not involve any use of the inventive faculty. In the case before me it does not appear to have occurred, either to the prior patentees or to machine workers, before Eibel, that high speeds could be attained by using a high pitch. When the result was attained, however, the public was glad to profit by it. And the proofs show that the result of the Eibel invention has been a most extended commercial use of his process. This commercial utility and success may properly be invoked in favor of the patent.

The defendant contends that claims 1, 2, and 3 are void for indefiniteness.

In claim 1, Eibel has the breast roll end of the paper-making wire in the machine "maintained at a substantial elevation above the level, whereby the stock is caused to travel by gravity, rapidly, in the direction of the movement of the wire." Similar language is used in claims 2 and 3. The defendant says that the use of such words as "substantial elevation" and "rapidly" are so indefinite as to render the claims void. Eibel's inventive thought had for its object a process whereby the machine might be run at a much higher speed than heretofore. Eibel found the Fourdrinier machine with the wire running horizontally. He took the elements which were already in use and added to them a process whereby the breast roll end of the wire is maintained at a sufficient elevation above the level to make the stock travel by gravity at great speed. It is apparent from the testimony of the experts that it was impossible to know in advance the exact speed which any particular pitch would cause. This lack of knowledge beforehand was due to the variations in the stock used, and to the varied use of the different elements then employed in operation; sometimes the depth of the "pond" back of the slices would be greater than at others. The "drag" or "friction" of the wire on the stock might be different at different times. Other elements might vary. A sufficient pitch had to be given to cause a rapid gravity flow of the stock under all existing conditions. A pitch of 2 or 3 or 4 inches would not be enough. It must be found by practice what pitch of the wire would be enough to bring the speed of the stock up to the speed of the wire. The claims should not be pronounced void because they do not express in inches the amount of elevation required to achieve the result which Eibel had in mind. I think the claims should not be held invalid by reason of indefiniteness.

*2. Infringement.*—The defendant says that its machines do not infringe the claims of the patent in suit; that Eibel's proposition was to give the wire such an elevation that gravity *alone*, due to the pitch of the wire, would cause the stock to attain the same speed as the wire at the point where the stock would lose its viscosity and settle down upon the wire in a thin sheet. The defendant urges that it has not given its wire such an elevation, and that, therefore, it does not infringe. In other words, the defendant contends that Eibel's invention contemplated that pitch *alone* should do all the work of bringing the stock from nothing up to an ultimate speed equal to that of the wire; that Eibel contemplated that there should be no "head" at all back of the slices, and that "drag" should be done away with altogether, as a factor in accelerating the speed of the stock; and that no machine comes within the Eibel inventive thought, unless that part of the stock speed which is contributed by pitch is greater than that part of the stock speed which is due to the other two factors. The learned counsel for defendant urge that, when Eibel speaks of a gravity machine, or of a "gravity feed," he refers to the use of gravity, to the exclusion of all other elements, and that when, in his claims, Eibel speaks of the stock traveling by gravity, he refers to the use of gravity without any help from other sources.

It is to be noted that Eibel's one object was to arrange a process by which the machine could be run at a much higher speed than heretofore. With this in view, Eibel organized his machines at the Rhinelander Paper Company in such a way that they had a pitch of about 14 inches and run at a speed between 500 and 600 feet per minute. To produce this result he used gravity. He used, also, the elements which he found at hand, namely, the "drag" and the "head," due to the depth of the "pond" back of the "slice." His effort was to get speed; he did not wish to abolish or disregard any of the elements which helped him to get speed.

But, if the contention of the defendant is correct, he did not put his own invention into practical use at Rhinelander, or at any other place; for in practice he did not obtain his speed by gravity alone. In fact, the defendant's experts testify that the mode of operation set forth in the Eibel patent in suit has never been put in practical use by anybody; it was not used at Rhinelander; it was not used in the other mills; it is not embodied in the drawings of the patent.

I cannot sustain such contention. I cannot so construe the specification and claims of the patent. Eibel introduced a new speed-making factor. He proposed to bring the speed of the stock up to the speed of the wire, and to use gravity to that end; but I cannot hold that he contemplated that gravity should be used to the exclusion of the other elements which were already in use. He found those elements at work; there is no reason why he should exclude them from helping along the work. The process invented by him begins to operate after the stock has entered upon the wire. His apparent attempt was to get rid of bubbles and wrinkles, before he got to the place on the machine where paper is formed. To do this, he allowed gravity to work with "drag" and with "head." He harnessed all the elements he could find. He brought gravity in with the other elements, and so brought the speed of the stock up to equality with that of the wire. By this means he achieved high speed and also freed the stock on the wire from waves and ripples.

The proofs show that the defendant has used a substantial pitch, and not merely the trivial pitch employed for drainage adjustments, and that it has used this pitch in order to call gravity into operation, as an accelerating factor, to speed the stock up to a speed equal to that of the wire. I think it must be held that the defendant infringes the principles of the Eibel patent.

The proof indicates that the defendant has used, in some machines, a pitch of 12 or 14 inches. In these machines it clearly infringes. Testimony tends to show that it has used a smaller pitch of about 6 inches in what is called a No. 2 machine. In the present aspect of the case, I think it unnecessary to decide whether or not the use of the smaller pitch in the No. 2 machine is or is not an infringement.

Coming to the details of infringement: It is evident, from what I have already said, that the defendant infringes claims 1, 2, and 3 of the patent. Claims 7 and 8 are machine claims, referring to that element of the machine which is found in claim 3, namely, the declination of the paper-making wire from the breast roll to the guide roll, and including

the suction boxes in such declination. The extent of the declination is not given in precise terms, but it must be "substantially as described" —that is, it must be a substantial declination. It seems to me clear from the evidence that the defendant infringes, also, claims 7 and 8.

Claim 12 specifies that the speed of the stock and wire shall be so adjusted that waves and ripples on the stock are substantially avoided, and the fibers deposited with substantial uniformity; this being a result obtained by the claims 1, 2, and 3. Claim 12 is a process claim. It clearly involves the principles of claim 1. I think the evidence in the record shows an infringement by the defendant, of claim 12. My conclusion, then, is that claims 1, 2, 3, 7, 8, and 12 are valid and infringed. A decree may be entered for the plaintiff for an injunction and for an accounting.

The plaintiff recovers costs.

The plaintiff may present a draft decree on or before October 9, 1920. The defendant may present corrections, if any, on or before October 25, 1920. The decree is to be settled October 30, 1920, at 10 o'clock a. m.