## AMERICAN TUBE WORKS v. BRIDGEWATER IRON CO.

(Circuit Court of Appeals, First Circuit.   August 25, 1904.)

### No. 523.

1. APPEAL—ISSUES REVIEWABLE.
    Where a decree dismissing a bill is general, all defenses pleaded are open to the defendant on appeal, although one only may have been sustained by the trial court in its opinion.

2. PATENTS—ANTICIPATION—CONSTRUCTION OF CLAIMS.
    The Adams patent, No. 24,915, for "a tube or cylinder cast out of copper and free from blowholes and other similar defects, when produced as herein stated," covered a product only, and not the process, and was void for anticipation, it being shown that other processes previously in use also produced sound copper tubes, although not so large a percentage as that described in the patent.

3. SAME—SUIT FOR INFRINGEMENT—LACHES.
    Where a patentee, who had contracted to obtain an extension of his patent, if possible, and to assign the same to plaintiff, made a compromise agreement with defendant, which was opposing the extension, by which the opposition was withdrawn, and defendant was to have a license to use the patented device, plaintiff, with knowledge of the agreement made for its benefit, was bound thereby, and in any event was barred by laches from maintaining a suit in equity for infringement against defendant commenced within less than a month before the extended patent expired, and more than three years after it had full knowledge of all the facts, during which time it made no claim of infringement.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 124 Fed. 782.

George L. Roberts and George Wm. Estabrook, for appellant.

Robert F. Herrick and Richardson, Herrick & Neave, for appellee.

Before HOLMES, Circuit Justice, PUTNAM, Circuit Judge, and ALDRICH, District Judge.

HOLMES, Circuit Justice.   This is a bill in equity alleging an infringement of a patent for cast copper tubes, granted to Freeborn Adams on August 2, 1859, and extended for seven years from August 2, 1873, the extended patent having been assigned to the plaintiff. The bill prays for a permanent injunction and an account covering the extended term.   The Circuit Court made an interlocutory decree in favor of the plaintiff, the case was referred to a master and a

¶ 2. Laches as a defense in suits for infringement of patents, see notes to Taylor v. Sawyer Spindle Co., 22 C. C. A. 211; Richardson v. D. M. Osborne & Co., 36 C. C. A. 613.

careful report was made.   Upon facts discovered at the hearing and now appearing in that report, the defendant filed a supplemental bill, in the nature of a bill of review, setting up that an alleged license from Adams, which had been relied on in the answer, was granted with the privity of the plaintiff.   The Circuit Court agreed with the master that the facts established this defence and entered a decree dismissing the bill, whereupon the plaintiff appealed to this court. The decree was general and therefore all defences are open here.

The question is raised in the first place whether the bill was not filed too late.   It was filed on July 10, 1880, and the patent expired on August 2 of the same year.   We shall assume, merely for purposes of decision, that the bill may be maintained as against that objection, because we are clearly of opinion, not only that the defence sustained by the Circuit Court is good, but also that the patent in the form in which it was taken out was invalid.

The patent to Adams stated its claim thus:   What I do claim (as a new article of manufacture) is a tube or cylinder cast out of copper and free from blow holes and other similar defects when produced as herein stated."   We assume that Adams had invented a new and valuable process, which it is unnecessary to describe, but by which he produced a much larger percentage of sound copper tubes than it had been possible to produce before.   But he took his patent for the product, and he must stand upon his claim as it was made.   Cast copper cylinders free from blow holes, when produced as stated in Adams's specification, were not different from perfect copper cylinders produced by casting in any other way.   Therefore it was admitted at the argument that, whatever might be necessary to constitute in infringement of Adams's patent, that patent was anticipated if cast copper cylinders free from blow holes were known and could be produced before.   Cochrane v. Badische Anilin & Soda Fabrik, 111 U. S. 293, 311, 4 Sup. Ct. 455, 28 L. Ed. 433.

Patents were put in by the defendant, which described methods of casting copper cylinders which the patents alleged would be perfectly sound, although the plaintiff objects that the boasts of the patents are not evidence of their own truth and that the experiments made contradict them.   There was evidence on the defendant's side, also, but we do not stop to weigh it.   It is enough that the plaintiff admits, what its own witnesses say, that in experimenting with the mode of casting known before Adams's invention, it had produced perfect tubes.   The testimony is not that none were made, but that the percentage of good tubes was so small that they considered the trials before Adams's success a failure.   This testimony is all that the defendant needs.   At the argument these occasional successes were likened to a chemical by-product which is found in the course of making something else, which is produced accidentally, no one knows how, which passes unnoticed, and which cannot be reproduced at will.   But the distinction, whether it be of degree or of kind, is plain enough.   The tubes referred to were produced by a method which was followed for the purpose of producing them and which, it fairly may be presumed, would produce them once in so often in the future

as it had produced them in the past. Why the attempt succeeded when it did succeed was not known. But even now it is not known with certainty why Adams's rotating moulds succeed, as they more often do. The difference between the old methods and the new is simply in the proportion between failure and success,—the best of distinctions if the process were in question, but inadequate to justify a patent for the product.

We pass now to the other defence which we have mentioned. When Adams applied for an extension of his patent in 1873, the defendant filed reasons in opposition. Thereupon a compromise was made on June 16, 1873, between Adams and the defendant, by which the defendant was to withdraw its opposition to the renewal, and, on the other hand, it was agreed that any process of manufacturing copper tubes then used by the defendant was not an infringement of Adams's patent. There was some argument as to the construction of this instrument, but it seems to us plain that the words were not confined to infringements in the past. Of course, therefore, if this agreement was made on behalf of the plaintiff as well as Adams, or if the making of it was known and assented to by the plaintiff, whether the agreement was lawful or not, the continued use of its own processes by the defendant with the consent of all parties interested could not be complained of now.

The defendant used no other processes than those referred to in the compromise, but it used those, and the plaintiff knew what it was doing, at least as early as March 30, 1877; yet the defendant never heard a word of protest from the plaintiff and the plaintiff made no public claim, although in keen competition with the defendant, until this bill was filed, just before the patent expired. On December 8, 1869, long before the compromise was made, Adams had made an agreement with the plaintiff, covenanting to apply for an extension of his patents and to make all efforts in his power to accomplish the same, and upon obtaining it, to assign it to the American Tube Works by a sufficient assignment, the Tube Works bearing the expense of the proceedings. There was also a covenant to pay five thousand dollars as liquidated damages in case of breach. Thus Adams had no interest in the matter except to save himself from liability. The plaintiff was the party to profit by the withdrawal of opposition. Evidently it knew of the withdrawal, because after the compromise the only notice of the taking of testimony which it gave to the defendant was given on the day when the testimony was taken. This fact, coupled with the acceptance of service by the defendant, showed some kind of concert or understanding between the parties.

The probability that the plaintiff at least knew what was being done is increased by the fact that its counsel acted for Adams, and it is made certain by a letter from Buckingham, the plaintiff's president, dated April 16, 1877, in which, after quoting the plaintiff's present counsel for the difficulties in the way of the Adams patent which we have stated, he says: "Perhaps all we can go for is the ¾ c. they promised to pay." This clearly refers to a stipulation in the Adams compromise, and the word "the" refers to it as something assumed to be known. We may mention also another letter of April 18, 1877,

from an employé of the company to its treasurer saying: "I find I am acquainted with R. K. Evans here, one of the lawyers who argued our case when applying for the extension." This brief recapitulation of the reasons which convinced the master and the Circuit Court seems to us unshaken by anything that was said before us. It would show inexcusable laches after April 16, 1877, even if it did not prove the plaintiff's consent to what the defendant did.

It was much pressed that more probably the compromise was a fraud concocted between Nahum Stetson, the defendant's president, and Adams. Why, otherwise, it was asked, was the defence not put forward until sixteen years after the bill was filed, when Stetson and Adams both were dead? The defendant had notice of the agreement of 1869 between Adams and the plaintiff when the bill was filed. But the difficulty raised by the omission appears to us by no means equal to the difficulties on the other side. Both parties seem to have been playing a pretty sharp game and to have had some reasons for keeping their relations shadowy. The plaintiff, so far as it adopted Adams's steps to procure an extension, was not very far from fraud, and also naturally would not put forward facts suggesting a doubt whether the extension should have been granted. The defendant was setting up a legal right under its license from Adams as against what it considered the merely equitable rights of the plaintiff under Adams's covenant of December 8, 1869. We express no opinion whether the defendant ought to have prevailed on that ground, but the contention at least was plausible. Until it was overruled by the Circuit Court, of course the defendant did not wish to charge itself with notice of the plaintiff's interest. If the defendant had sacrificed the defence which it was making and had relied upon the matter of the supplemental bill, it would have been unable to prove the plaintiff's knowledge otherwise than by inference until it discovered the Buckingham letter in the course of the trial. Apart from the greater difficulties on the other side, we see no sufficient reason to suspect a conspiracy between Stetson and Adams.

Some further argument was made from the contents of Buckingham's letter, that he could not have known the whole agreement of compromise. It is sufficient to say with regard to them that they seem to us to show nothing more than the average inaccuracy of a layman speaking of legal matters in what is called by the plaintiff's counsel a gossiping, friendly letter, coupled with a slightly unscrupulous attitude toward the defendant. The possibility of adopting this attitude was one of the plaintiff's advantages from not taking a direct part in the compromise of June 16, 1873.

As we have hinted, there are other obstacles which the plaintiff would have to overcome before it could prevail, but we think the foregoing reasons are sufficient to warrant us in affirming the decree.

The decree of the Circuit Court dismissing the bill is affirmed, and the appellee recovers its costs of appeal.