## NEW YORK SCAFFOLDING COMPANY *v.* CHAIN BELT COMPANY ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
SEVENTH CIRCUIT.

No. 23.   Argued October 7, 8, 1920.—Decided November 8, 1920.

Patent No. 959,008, claims 1 and 3, to Elias H. Henderson, for improve-
   ments in scaffold-supporting means, exhibits no invention over the
   prior art. Pp. 34, *et seq.  New York Scaffolding Co.* v. *Liebel-Binney
   Construction Co., ante,* 24.
The fact that a change in a composite instrumentality was readily
   made may be evidence that the change was the result of mere me-
   chanical facility as opposed to invention.  P. 36.
Advantages found in a patented device may count in favor of the
   patentee though he did not discern them when he secured his patent;
   but if the device is only an alteration of an earlier patented device,

involving no invention, they redound to the benefit of the earlier patentee though he also was unaware of them and did not attribute them to his invention. P. 37.

245 Fed. Rep. 747, reversed.

THE case is stated in the opinion.

*Mr. Frederick P. Fish,* with whom *Mr. C. P. Goepel, Mr. R. W. Hardie* and *Mr. F. C. Somes* were on the briefs, for petitioner.

*Mr. Wallace R. Lane* and *Mr. Robert H. Parkinson* for respondents.

MR. JUSTICE McKENNA delivered the opinion of the court.

Suit by petitioner against Chain Belt Company et al., for infringement of a patent considered in No. 22, *ante,* 24. The bill contains the usual allegations, and prays for an accounting, for damages, and injunctions, preliminary and final.

A copy of the opinion of the Circuit Court of Appeals for the Eighth Circuit in the suit of the Scaffold Company against Egbert Whitney, expressing the judgment of the court sustaining the validity of the patent and adjudging Whitney to be an infringer of it, is attached to the bill.

The answer denied invention and set forth a number of patents as anticipations, among others, a patent to William Murray. A dismissal of the suit was prayed.

A trial was had upon the issues thus made, which resulted in an interlocutory decree awarding an injunction, adjudging infringement, and an accounting.

The injunction decreed is as follows: "That an injunction be issued under the seal of this court, unto the said Chain Belt Company, and the said Egbert Whitney,

enjoining them, and each of them, their several agents, officers, employees and all persons in privity with them, and each of them, from making or selling, or causing to be made or sold, the machine known as 'Whitney Scaffold Hoist Machines,' and 'Little Wonder' machines, to be used in the combinations of claims 1 and 3 of said U. S. Patent No. 959,008, or from using or causing said machines to be used in the combinations of said claims, or from infringing upon said claims in any manner whatsoever."

The Circuit Court of Appeals agreed with the District Court that the Henderson patent exhibited invention, expressing the view, however, that, while its advance was slight, it was "not so wholly wanting in invention or novelty as to justify a finding contrary to the presumptive validity of the grant to him." The court fortified its views by the decision of the Circuit Court of Appeals of the Eighth Circuit in *New York Scaffolding Co.* v. *Whitney*, 224 Fed. Rep. 452, citing, however, to the contrary, the decision of the Circuit Court of Appeals of the Third Circuit, in *New York Scaffolding Co.* v. *Liebel-Binney Construction Co.*, 243 Fed. Rep. 577, the decision we have just affirmed. *Ante*, 24.

The court, however, decided that the decree was "erroneous in finding infringement in the manufacture or sale or in any use of the Little Wonder machine." The decree of the District Court was reversed with directions to enter a decree in accordance with the views expressed.

The Henderson patent was made the basis of recovery in *New York Scaffolding Co.* v. *Liebel-Binney Construction Co.*, No. 22, just decided, and there we estimated its inventive quality as tested by the prior art, and as representative of that we took the patent of William Murray, accepting it as an advance upon the prior art.

We need only add to what was there said that our conclusion is confirmed by Henderson's testimony, which

we insert in the margin somewhat fully, as it cannot be adequately represented in condensation or by paraphrase.[1]

---

[1] After stating the schools and colleges he had attended, and that he was admitted to the bar in 1910, he testified as follows:

"Q. Will you state when you first acquired any knowledge of the scaffolding business and how it came about?

A. The first time I had any occasion to consider scaffolding on buildings was about in February, 1910—February, 1909.   I was having dinner with Mr. Merrill, then president of the Noel Construction Company, and I explained to Mr. Merrill a certain gas engine I was designing attempting to get a patent at that time, and Mr. Merrill, whom I had known while I was at the academy at Annapolis, put up to me a proposition of scaffolding on the city hall, which the Noel Construction Company was then building in Chicago, and explained to me the great expense of building up a scaffold from the ground, and stated that it was much more convenient and cheaper to scaffold by swinging the scaffold from an overhead outrigger.   He said there was such a scaffold in use and being put up by a New York concern, but that the rental charged by the New York concern was prohibitory of its use on the city hall, and said with my mechanical training I ought to be able to devise a means of swinging a scaffold, and instructed me to go ahead and see what I could do.

  *     *     *     *     *     *     *     *

A. It was in February, 1909."

He further testified that Mr. Merrill called his attention to devices that were then in use in Chicago at the Blackstone Hotel, and that shortly after he went down to the hotel.

He further testified:

"A. On the north side of the building there was a scaffold suspended by overhead outriggers, cables led down to a drum, the cable passed over a little pulley wheel on the top cross member of the scaffold down to a drum, and the drums were in pairs opposite at right angles to the building.   These drums were supported above a U-frame which was held in place, bolted, with two angle irons, the bolts passed thro' the U-frame, and then the planking were laid along the scaffold on top of the angle irons which was bolted to the U-frames and the drums were operated by means of the ratchet lever, to which the men put a pipe, making an extension, and pumped it up and down.

Q. Just how were the putlogs supported relative to the U-frame concerning which you have testified?

From his testimony, it is certain that his scaffold did not cause him sleepless nights or laborious days. He was not experienced in the art of which it is an example. It may be that the conceptions of invention cannot be tested by such experience or by moments of time, and that originality

A. The putlogs were bolted alongside of the U-frame and the bolts passed through the U-frame.

Q. Did you see the machines operate?

A. Yes, the men were laying brick along the scaffold, a couple of laborers hoisted one end of the scaffold.

Q. So you saw it raised during the time you were there?

A. Yes, sir.

Q. At that time had you done any work on what later developed into your patent in suit?

A. I had not."

And further:

"A. I didn't do anything further until about the middle of May. Mr. Merrill called me up and asked to come down to the office. I went down and he asked me if I had a scaffold ready for him, or had any ideas. I told him no, that I had not. He said, 'I have been depending upon you to design something, and I have got to have something.' So he called in Mr. Peterson, the superintendent, took me over to the city hall and showed me the wall he wanted to scaffold in the court there, and I then went over to Carpenter & Company and inspected some winches he had there to see if it was practicable to bolt the winches to wooden putlogs. And owing to the fact that Carpenter & Company wanted more money than Merrill could pay, for scaffold, didn't make a deal with him. Then I went home and made up the design for the scaffold that I subsequently applied for a patent on, and took it down to Brown & Williams' attorneys, and asked them if I could get a patent on it. They thought I could. Mr. Merrill said he would have Parker & Carter investigate if there would be no infringement on the winch and instead of bolting the windlass to the putlog, I found I could utilize pieces of 2x10 around the building for putlogs and place them in the U-frame, and would make the scaffold easier to put into the building and much simpler to dismantle—take off.

Q. Where did you get your knowledge of the U-frames being used in this line of work?

A. I saw U-frames on the Blackstone Hotel. It is just an ordinary stirrup."

does not need the aid or delay of drudgery; but one is forced to think that where a change is readily made in any composite instrumentality the change is not the prompting or product of invention. Indeed, it is a common experience in patent cases that mere mechanical facility can alter or change the form in which originality and merit expressed themselves and assert for it the claim of invention. This case is an example of such pretension. We may repeat counsels' question and ask, What did Henderson do that Murray did not do? He made the U-frame which supported the hoisting device of continuous metal instead, as Murray did, of several pieces riveted together, and in the stirrup which it formed he rested the putlogs or beams loosely making a hinged joint connection between the stirrup and the hoisting machines with a resulting flexibility. This consequence and its advantage, if it have such,[1] it is admitted, he did not discern, and naturally. His purpose was evasion. To evasion he was prompted. Beyond what was necessary to that, he exerted no vision or conception. He had had no experience in the art, and what knowledge of the Murray scaffolding he had was obtained by a thirty minutes' observation of it in operation. We yield to the assertion of counsel that he cannot be deprived of an advantage because he did not discern it, but the same concession must be given to Murray. He was entitled to all of the benefit that he claimed for his device, or that can be given to it by formal changes.

It will be observed that the Circuit Court of Appeals and the District Court disagreed in their views of the re-

---

[1] There is a denial of advantage, and it was admitted at the argument that rigidity of the putlog and frame was sometimes resorted to. Counsel tried to minimize the necessity or practice by saying that it was accomplished by a ten-penny nail. Manifestly it was the effect and its necessity or advantage which were important, not the means of their accomplishment, and the necessity or advantage cannot be estimated by the size of the nail.

lation of the Little Wonder machine to the Henderson device, the latter considering it an infringement, the former determining otherwise, and to that extent reversing the decree of the District Court. · Both courts, however, concurred in ascribing invention to the Henderson device. In this both courts erred, and the decree of the District Court is therefore reversed and the case remanded to that court with directions to dismiss the bill of complaint on the ground that the Henderson patent is invalid, it exhibiting no invention.

*Reversed.*