## MINNESOTA & ONTARIO PAPER CO. v. EIBEL PROCESS CO.

· (Circuit Court of Appeals, First Circuit. June 29, 1921.)

### No. 1504.

1. **Patents ⬳328—845,222, for improvement in Fourdrinier machines, held invalid and not infringed.**
   The Eibel patent, No. 845,222, for an improvement in Fourdrinier machines for making paper, claims 7 and 8, *held* void for lack of invention. Claims 1, 2, 3, and 12, if construed to cover any elevation of the breast roll of the paper-making wire appreciably greater than that shown by the prior art, are void for indefiniteness and as differentiated from the prior art only by a mere change in degree. If construed in accordance with the natural import of the language, as requiring such a pitch of the paper-making wire as will alone, through gravity, without regard to the head in the flow box, bring about speed equality between the stock and the wire, and practically eliminate the drag of the wire, it discloses no useful invention, since no such pitch has ever been used or claimed to be useful in practice. If conceded validity, as so construed, *held* not infringed.

2. **Patents ⬳19—Mere change in degree not patentable.**
   A patent on a mere difference in degree in the use of a principle shown in the prior art is invalid.

3. **Patents ⬳52—Incidental, but known, benefits of prior art practice not patentable.**
   The principle which gives a patentee the benefit of advantages of his invention, which he did not discover, also applies to prior art uses.

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit in Equity by the Eibel Process Company against the Minnesota & Ontario Paper Company. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 267 Fed. 847.

Amasa C. Paul, of Minneapolis, Minn., and Livingston Gifford, of New York City (Nathan Heard, of Boston, Mass., and Richard Paul and Maurice M. Moore, both of Minneapolis, Minn., on the brief), for appellant.

Harrison F. Lyman and Frederick P. Fish, both of Boston, Mass. (Guy Cunningham, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. [1] The District Court held claims 1, 2, 3, 7, 8, and 12 of the Eibel patent, No. 845,222, dated February 26, 1907, valid and infringed. 267 Fed. 847. The patent is on its face for an "improvement in Fourdrinier machines."

For generations the Fourdrinier has been the best known and most commonly used paper-making machine. It consists, in its first section, of an endless wire sieve, passing over a series of rolls at a constant speed. At the wet or breast-roll end of this running wire sieve there is discharged from a flow box through a slice a stream of paper-

making stock, consisting of wood pulp, sometimes with added mineral matter, mingled with from 135 to 200 times its weight in water. The stock has the appearance of diluted milk. The wire mesh over which the stock travels has also a sidewise shaking motion to assist in the proper felting and interlocking of the fibers. The stock is carried along on this wire about 29 or 30 feet, draining off its water as it goes, until it reaches the couch rolls at the farther end of the wire, where it is pressed into the form of a uniformly distributed wet pulp or web strong enough to hold together. It is then carried through a series of pressing and drying rolls and calendars, which constitute the drying end of the machine. About 20 feet from the breast roll are placed suction boxes in contact with the under surface of the wire, operating by means of a partial vacuum to assist in the extraction of excess water remaining in the pulp and to compact the sheet by atmospheric pressure.

The foregoing is but a meager description of the first part of a large and complicated machine upon which paper stock goes in highly diluted liquid form, is subjected to draining, shaking, meshing, pressing, and heating processes, until it emerges as a smooth fabric—news print.

These Fourdrinier machines are expensive, costing about $100,000 each. As matter of economy, they run continuously, day and night. Speed—which means quantity—and quality of paper have been for decades the constant quest of paper makers. In operation it is manifest that, as the stock drains, meshes, and settles upon the wire, it must at some point be brought to speed equality with the wire. It is agreed that this point of speed equality is, normally, about 9 or 10 feet from the breast roll.

The evidence shows, and it is obvious, that if, as the bulk of the water drains out of the stock, there be too great difference between the speed of the wire and the speed of the stock, a commotion of ripples and waves will result, which may, and frequently does, cause wrinkles and other defects in the paper. Moreover, if the forming fabric breaks, because of too high speed or other cause, the machine has to be stopped, and continuous and economical production is prevented.

The evidence also shows, and it is manifest, that the successful operation of such a machine involves constant study and adjustment of numerous factors, such as the speed of the wire, the weight of paper desired, the quality of the stock (described as quick or slow, accordingly as the fibers part with the water quickly or slowly, as well as containing a varying amount of water ranging from 135 to 200 times the weight of the fibrous matter), the amount of head in the flow box, as well as the grade of the wire carrier.

There are three factors, all or any two of which may be used, in any preferred relative proportions, to bring about the necessitated speed equality between the stock and the wire, 9 or 10 feet from the breast roll:

(1) Initial speed due to the head in the flow box from which the stock comes upon the wire. Heads in common use run from 2 to 10

inches. Obviously, the greater the head the greater the initial velocity of the stock.

(2) The wire itself may be pitched downhill, so as to give an increasing speed by gravity; it may be level; or it may be tipped the other way, so as to require the stock to run uphill. These factors, described as two, are really only one—head and downhill pitch being nothing but gravity; or, as the plaintiff's expert put it, the lower the head the more pitch is required.

(3) The third factor is described as "the drag of the wire," meaning the acceleration between a lower initial speed, at which the stock is assumed to start upon the wire, caused by the friction or adherence of the stock to the wire, in bringing the speed of the stock up to equality with the movement of the wire, on which it must ride as a pulpy fabric before it reaches the couch roll.

The plaintiff's general contention is that, before Eibel made in 1907 his alleged invention, Fourdrinier machines running faster than 450 to 500 feet a minute caused irregularity, or "wildness," in the paper, because at high speeds there was too great a difference between the stock speed and the wire speed to be overcome by the drag, resulting in carrying the under part of the liquid stock faster than the upper part, thus causing excessive and injurious waves and ripples. It is contended that Eibel conceived a notion, described as "a brilliant discovery," of calling in gravity, applied by pitching the wire, to supplement drag as a means of speeding up the stock on the wire, thus obtaining a better quality of paper, and also enabling the wire itself to be speeded up beyond what had hitherto been regarded as the normal speed, so as to get a larger output. Eibel applies his alleged invention by blocking up the breast end of the machine, or by raising the breast end of the wire by a worm screw, or by any other suitable method. The infringement charged against the defendant is that it is operating its machines with the breast end of the machines, or at any rate the breast end of the wires, raised 12 to 15 inches above the level.

The defendant contends that the patent involves no invention; that Eibel's adjustment of the machines differs merely in degree from practices shown in the prior art; and that, if the patent can under any construction be held valid, the defendant does not infringe.

Turning now to the patent, which must be somewhat fully stated: It is termed, as noted above, "improvement in Fourdrinier machines." In the specification it is said:

"This invention relates to Fourdrinier machines, and has for its object to construct and arrange the machine whereby it may be run at a very much higher speed than heretofore, and produce a more uniform sheet of paper which is strong, even, and well formed. My invention is embodied, essentially, in the first part or element of the machine having the Fourdrinier wire, or paper-making wire, and *consists in causing the stock to travel by gravity in the direction of movement of the making wire and approximately as fast as the making wire moves, thereby resulting in a 'gravity feed' for the machine.* The stock may be and preferably is caused to travel more rapidly than the normal or usual speed of the making wire for a certain grade of stock, and means are provided for increasing the speed of the machine, so as to cause the making wire to move at a higher rate of speed than usual, being substan-

tially equal to the speed of the rapidly moving stock. To accomplish this result in a simple manner, the breast-roll end of the paper-making wire is maintained at a substantial elevation above the level, thereby providing a continuous downwardly moving paper-making wire, *and the declination thus given to the wire is such that the stock is caused to travel by gravity in the direction of the movement of the wire and substantially as fast as the wire moves.* The declination of the paper-making wire may be adjustable, or the speed of the wire may be variable, or both the declination and speed of the wire may be adjustable, in order that *the velocity produced by gravity in the stock on the declining wire will approximately equal the speed of the wire.* By this arrangement the speed of the machine may be increased to such an extent as to bring the speed of the making wire up to the maximum velocity of the rapidly moving stock and a strong, even, and well-formed sheet produced which is more uniform than usual."

The drawing in the patent shows the wire elevated at the breast roll approximately 14 inches, by means of a screw; but the specification expressly says that any other suitable means may be employed for this purpose.

Eibel continues:

"The Fourdrinier wire has usually been arranged to move in a horizontal plane, although I am aware that means have been provided for adjusting the breast-roll end of the wire to different elevations, usually below the level, to provide for running with different grades of stock—as, for instance, with quick stock and slow stock; but so far as I am aware the making wire has always had to perform the work of drawing along the stock, and as the wire moved much faster than the stock, the stock waved or rippled badly near the breast-roll end of the wire, which gradually diminished until an equilibrium was established, and a smooth, even, and glassy surface presented, and not until the waving or rippling ceased did the fibers lay down uniformly and produce a well-formed sheet of paper."

But he states:

"In accordance with my invention, I operate entirely above the level *to cause the stock to travel by gravity at a velocity approximately equal to the speed of the making wire,* which I believe to be a new principle of operation. The breast-roll end of the making-wire *a* is maintained at a substantial elevation above the level, so that the wire declines. *The declination of the wire is sufficient to enable the stock by gravity to move at a rapid rate of speed, which speed is substantially equal to the speed of the making wire,* so that the waves or ripples are eliminated."

He adds that the pitch may be continuous from the breast roll to the guide roll, or only from the breast roll to the suction boxes, preferably the former. Also:

"The elevation above the level at which the breast-roll end of the making wire is maintained will vary according to the grade of stock; but *in any event it will be substantial, so as to cause the stock to move rapidly by gravity."*

"For the purpose of increasing the speed of the machine to the maximum I maintain the breast-roll end of the making wire at a high elevation above the level, *so that the stock travels by gravity much faster than the making wire ordinarily runs for a certain grade of stock, and I then increase the speed of the machine to such extent as to bring the rate of speed of the making wire up to the speed of the rapidly moving stock,* and as a result the capacity of the machine is largely increased. I find in practice that, by providing a gravity feed operating substantially as herein described, the stock runs smoothly and evenly, without waving or rippling, and the fibers are thereby permitted to settle with great uniformity as regards their distribution over

the wire, so that the paper in addition to being well formed, is very uniform. Furthermore, *as the stock is moving with the paper-making wire instead of being moved by the wire, or essentially by the wire*, the/ formation of the paper will begin at the start, and will continue to the end of the travel of the stock with the wire. Furthermore, by making the sheet of paper uniform over all, less sulfite or strengthening material is required. Furthermore, as the stock carries less water when arriving at the suction boxes, the amount of suction ordinarily required may be reduced, thereby reducing the friction due to the making wire passing over the suction boxes, and hence increasing the life of the wire."

The claims in suit are as follows:

"1. A Fourdrinier machine having the breast-roll end of the paper-making wire maintained at a substantial elevation above the level, *whereby the stock is caused to travel by gravity, rapidly, in the direction of movement of the wire, and at a speed approximately equal to the speed of the wire*, substantially as described.

"2. A Fourdrinier machine having the breast-roll end of the paper-making wire maintained at a high elevation, *whereby the stock is caused to travel by gravity faster than the normal speed of the wire* for a certain grade of stock, and having means for increasing the speed of the machine *to cause the wire to travel at substantially the same rate of speed as the rapidly-moving stock, substantially as described.*

"3. A Fourdrinier machine having the paper-making wire declined from the breast roll to the guide roll, the breast-roll end of the wire being maintained at a substantial elevation above the level, whereby the stock *is caused to travel by gravity, rapidly, in the direction of movement of the wire and at a speed approximately equal to the speed of the wire*, substantially as described."

"7. A Fourdrinier machine having the paper-making wire declined from the breast roll to the guide roll, and the suction boxes supported at a corresponding declination, substantially as described.

"8. A Fourdrinier machine having the paper-making wire declined from the breast roll to the guide roll, and the several suction boxes arranged at different elevations, substantially as described." ·

"12. In a Fourdrinier machine, a downwardly-moving paper-making wire, the declination and speed of which are so regulated that the velocity of the stock down the declining wire, caused by gravity, is so related to the velocity of the wire *in the same direction that waves and ripples on the stock are substantially avoided, and the fibers deposited with substantial uniformity on the wire, substantially as described.*"

No reference is made in the patent to head as a speed-producing factor. Gravity, due to pitch and not to head, and the drag of the wire, are the only speed-producing forces recognized by the patent, at any rate directly. In 18 different places in the specification and 12 claims, Eibel refers to gravity as the force causing the stock to move approximately or substantially as fast as the wire moves. We have italicized such references in the portions of the patent quoted above.

The parties are in sharp and irreconcilable conflict as to the construction to be put upon the claims in suit. The plaintiff construes claims 1, 2, 3, and 12 as process claims, and contends that the words "substantial elevation" in claims 1 and 3 and "high elevation" in claim 2 cover any elevation of the breast roll ·of the paper-making wire appreciably greater than that shown in the prior art, contended to be any elevation exceeding 5, or at any rate 6, inches. Plaintiff's expert testifies that a 5-inch pitch would not necessarily be the Eibel invention, "but it might be on the border line"; that he hardly thinks a 4-inch pitch would involve the Eibel invention. It is therefore conceded by

the plaintiff that the prior art shows pitches of 3 or 4, and perhaps 5, inches. Consequently plaintiff contends that the words "substantial elevation" and "high elevation," in these claims, cover all pitches an inch or more in excess of the pitches shown in the prior art.

The defendant contends that, so construed, the so-called process claims are void for indefiniteness, and as differentiated from the prior art only by a mere change in degree; also that the claims, fairly construed, limit or define the words "substantial elevation" and "high elevation" by the later language of the claims, which, construed with the specification, means that the pitch must be enough so that gravity alone will bring the stock up to the speed of the wire. It is difficult to read the patent otherwise. As already noted, the patent is silent as to head. As the uncontradicted evidence shows that pitch adequate to eliminate drag is, even with a 2-inch head, not less than 48 inches, and that the defendant's alleged infringement consists only in using a pitch not exceeding 15, or at most 18, inches, the defendant contends that, if the patent as fairly construed can be held valid, there is no infringement.

Such pitches as 40 to 54 inches have never been used. It is not now claimed that Eibel discovered that such pitches are useful, or that their use would be Eibel's invention. If, therefore, the patent describes such pitches, it describes something not claimed as an invention, as well as something not infringed. If Eibel did not mean such pitch as would practically eliminate drag, in 18 places the language used requires a strained and unnatural construction.

The plaintiff—at any rate by implication—concedes that the first three claims which cover the essence of the alleged invention can be sustained only as process claims. It is noteworthy that no such word as "process" or "method" is found in these claims or in the specification. But it is not, and cannot be, contended that Eibel invented a new machine. As pointed out by Judge Warrington, in the English decision holding the corresponding English patent invalid (European Eibel Co., Ltd., v. Edward Lloyd, Ltd., Illustrated Official Journal [Patents], June 21, 1911, pp. 349, 356):

"The patentee proposes no alteration in the machine itself; the machine remains identically what it was before. He does not produce a new machine; all he suggests is what he considers a novel and useful mode of employing the old machine to produce the same article."

The plaintiff does contend that claims 7 and 8, referring to adjusting the suction boxes, so as to correspond with the pitch or declination of the wire are machine or machine improvement claims. But, apart from prior use, it is difficult to believe that such rearrangement of suction boxes as to enable them to perform their accustomed function of extracting water from the stock moving over the wire above, can be anything other than an ordinary mechanical adjustment. We cannot believe that claims 7 and 8, in and of themselves, involve any invention. At any rate, prior use at the Northern Paper Company as early as 1904 effectually disposes of these claims.

Referring, then, to claims 1, 2, 3 and 12, all of them deal with the

old Fourdrinier machine so adjusted that the breast-roll end of the paper-making wire will have a "substantial elevation." The insertion of iron or wooden blocks under that end of the machine, or the raising of the wire by a worm screw, or by any other common device for lifting that part of the old machine, is the only change required by the alleged invention. In a word, the plaintiff contends that the user of a Fourdrinier machine, who blocks up the breast-roll end of the machine, say 5, 6, or more inches, is an infringer upon the Eibel patent.

There is obvious difficulty in construing these claims as process claims. They are not so phrased. It is elementary that the patentee can have nothing beyond what he has particularly pointed out and distinctly claimed, so that those familiar with the art may correctly draw the line between public right and private monopoly. McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800; Merrill v. Yeomans, 94 U. S. 568, 24 L. Ed. 235. Eibel says, in effect:

"I claim a Fourdrinier machine adjusted at such a pitch, downhill, that the stock will run as fast as the wire."

He does not say:

"I claim a new process of making paper on a Fourdrinier machine, described as follows," etc.

We find no case which flatly holds that a patentee who, in his specification and claims, refers to a machine, and nowhere claims a patent on a process, has been held entitled to have his patent construed as covering a process.

In American Tube Works v. Bridgewater Iron Co., 132 Fed. 16, 65 C. C. A. 636, an opinion in this court by Circuit Justice Holmes, sitting with Judges Putnam and Aldrich, the following is stated:

"The patent to Adams stated its claim thus: 'What I do claim (as a new article of manufacture) is a tube or cylinder cast out of copper and free from blow holes and other similar defects when produced as herein stated.' We assume that Adams had invented a new and valuable process, which it is unnecessary to describe, but by which he produced a much larger percentage of sound copper tubes than it had been possible to produce before. *But he took his patent for the product, and he must stand upon his claim as it was made.*" (Italics ours.)

See, also, Boston Elastic Fabrics Co. v. East Hampton Rubber-Thread Co., 3 Fed. Cas. 945, No. 1,676; Burr v. Duryee, 1 Wall. 531, 17 L. Ed. 650.

The case of Breuchaud v. Mutual Life Ins. Co., 166 Fed. 753, 756, 92 C. C. A. 433, 436, cited by the plaintiff as authority for its proposition that, "it is immaterial whether they [the claims] are phrased in terms of process or of machine," falls far short of being an authority for so broad and far-reaching a proposition.

Claims 1 and 2 in the Breuchaud patent, held to be process claims, plainly describe a method or process for the construction of subbases for old walls. In claim 1 the word "method" is used and the method described. In claim 2 the phrase "while they are driving" was said by the court to indicate a process. Claims 3 and 4, which were for the product of the process, were held void.

We refer to the difficulty on this point, in order to make it clear that we do not, by implication, adopt the plaintiff's rule of construction. We are not now prepared to hold that claims 1, 2, 3, and 12 of the Eibel patent do "particularly point out and distinctly claim" (Rev. Stat. § 4888 [Comp. St. § 9432]) alleged new processes.

There is much reference in plaintiff's brief to "the Eibel principle." Of course there can be no valid patent on a mere "principle." Burr v. Duryee, 1 Wall. 531, 17 L. Ed. 650; Walker, Patents (5th Ed.) § 7.

But, if we assume this first doubtful proposition determined in the plaintiff's favor, there are other difficulties in the way of sustaining the patent that we find insuperable.

On the plaintiff's construction of the first three vital claims it is necessary to construe the words "substantial elevation," in claims 1 and 3, and "high elevation," in claim 2, so as to avoid the otherwise fatal objection of indefiniteness. What do the words "substantial elevation" and "high elevation" mean?

[2] Now, as already stated, the plaintiff admits that the prior art shows elevations of 4, and perhaps 5, inches in the breast-roll end. The plaintiff is therefore necessitated to contend that the words "substantial elevation" and "high elevation" mean something in appreciable excess of the prior art elevation. The result is that, in effect, the plaintiff claims that, if the prior art shows pitches of 4 inches, then 5 inches is Eibel's invention; that, if the prior art shows 5 inches, then 6 inches is Eibel's invention. Obviously, this construction puts upon the reader of the patent, in construing the words "substantial elevation" and "high elevation," the burden of knowing what pitches had been used in the prior art. Concededly a patent on a mere difference of degree in the use of a principle shown in the prior art is invalid. And so are all the authorities. Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566; Grant v. Walter, 148 U. S. 547, 553, 13 Sup. Ct. 699, 37 L. Ed. 552; Burt v. Evory, 133 U. S. 349, 358, 10 Sup. Ct. 394, 33 L. Ed. 647; Market Street Railway Co. v. Rowley, 155 U. S. 621, 15 Sup. Ct. 224, 39 L. Ed. 284; Fox v. Perkins, 52 Fed. 205, 3 C. C. A. 32; Galvin v. City of Grand Rapids, 53 C. C. A. 165, 115 Fed. 511; Eames v. Worcester Poly. Institute, 123 Fed. 67, 60 C. C. A. 37.

We think it very clear that, adopting for the moment the plaintiff's own construction of these claims as covering a process, and as covering any pitch in the Fourdrinier machine appreciably greater than the 4 or 5 inches shown in the prior art, the claims cover nothing but a difference in degree.

This conclusion will be made plainer if we illustrate the operation of gravity through the two different methods of pitch and head in producing speed on the wire. The evidence shows, and it is plain on elementary principles, that pitch and head are nothing but gravity applied to the liquid stock in two slightly different ways. The uncontradicted expert evidence shows that, ignoring friction—

"* * * the speed of flow attained by water in running down hill is the same as the speed or velocity under which water will be discharged from an orifice under a hydraulic head equal to the vertical height of the hill."

A table based on data taken from an Engineer's Hand Book in common use and printed in defendant's brief will conveniently illustrate this aspect of the problem:

|  |  | Initial Speed. | 3″ Pitch. | 6″ Pitch. | 9″ Pitch. | 12″ Pitch. | 15″ Pitch. |
|---|---|---|---|---|---|---|---|
| 0 | Head | 00 | 138.6 | 195.6 | 240.6 | 276.6 | 308.4 |
| 3″ | " | 240.6 | 276.6 | 308.4 | 340.2 | 366.6 | 391.0 |
| 6″ | " | 340.2 | 366.6 | 391.0 | 417.0 | 438.0 | 459.0 |
| 8″ | " | 391.0 | 417.0 | 438.6 | 459.0 | 481.8 | 500.4 |
| 10″ | " | 438.6 | 459.0 | 481.8 | 500.4 | 518.4 | 538.8 |

The figures in the first column of this table indicate the initial speed at which the liquid stock will enter upon the wire under the various designated heads in the flow box. The figures in the other columns show the speed that the stock will attain at a point 9 or 10 feet from the flow box, where, normally, there should be equality of speed between the wire and the stock.

Although the plaintiff's patent makes no reference to head as a speed-producing or gravity-using factor, we assume, as plaintiff's counsel contends, that the machine would hardly be expected to operate without any head at all.

Plaintiff contends that heads from 2 to 8 inches are to be regarded as normal. Many illustrations given by the plaintiff's expert are based on a head of $2\frac{1}{4}$ inches. Compare also Judge Mayer's opinion in Eibel Process Co. v. Remington-Martin Co., 234 Fed. 628, 148 C. C. A. 390. On the plaintiff's proposition, therefore, a 3-inch head could not be regarded as abnormal.

Referring, then, to the table, it will be observed that, assuming the stock projected upon the wire from a 3-inch head, the initial speed will be 240.6 feet per minute; that the speed acquired in traversing one-third of the distance from the flow box towards the guide roll will, through the effect of different pitches and a 3-inch head, be as follows:

| 3″ Pitch. | 6″ Pitch. | 9″ Pitch. | 12″ Pitch. | 15″ Pitch. |
|---|---|---|---|---|
| 276.6 | 308.4 | 340.2 | 366.6 | 391 |

Further analyzing, it appears that the 3-inch pitch, admitted to be prior art, adds to the initial speed produced by a 3-inch head 36 feet; that a 6-inch pitch, claimed to embody Eibel's invention, gives at the same point on the wire a further additional speed of only 31.8 feet; that the increased pitch from 6 to 9 inches increases the speed from 308.4 feet to 340.2 feet, or 31.8 feet, and so on.

Now, in the typical case of alleged infringement, the wire on the defendant's machine was said to be moving at a rate of 585 feet per minute. With a machine so operated, and assuming a 3-inch head and a 3-inch pitch, both prior art, the speed induced by gravity from both head and pitch would be 276.6 feet, leaving to be made up by the drag of the wire 308.4 feet. But if, instead of a 3-inch pitch, a 6-inch pitch be used (an alleged infringement) with the same head, gravity from such head and such pitch would produce a speed of 308.4, leaving to be made up by the drag of the wire 276.6. The contention, then, is that, by increasing pitch-induced gravity speed by 31.8 feet, the plaintiff's

patent monopoly is invaded. Otherwise stated, reducing the speed induced by the wire from 308.4 feet to 276.6 feet involves infringement.

Other interesting facts appear from this table. For instance, the initial speed of a 6-inch head upon a level wire, 340.2 feet (prior art), is exactly the same as the speed produced one-third of the way down the wire by a 3-inch head, plus a 9-inch pitch, alleged to infringe.

Again, an 8-inch head with a 3-inch pitch (prior art) gives the same result one-third of the way down the wire (417 feet) as a 6-inch head with a 9-inch pitch, claimed to be Eibel's invention.

Again, a 6-inch head with a 3-inch pitch, admittedly prior art, gives the same speed (366.6 feet) one-third of the way down the wire as a 3-inch head with a 12-inch pitch, claimed to embody Eibel's invention.

It will be observed that these equivalent results arise from the fact that 1 inch of head is equal to 3 inches of pitch, because only one-third of the pitch is really operative, as equality of speed between the wire and the stock is attained when the stock has passed only one-third the distance down the wire.

These comparisons sufficiently illustrate in figures the interchangeability of head and pitch as means of using gravity as a speed producer. The record shows instances of actual experience in using decreased pitch with increased head resulting in equal or greater operating speeds. The plaintiff's expert testified that, so far as speed equality is concerned, the same results can be secured from either head or pitch. And it was speed that Eibel was chiefly seeking. Judge Hale puts it:

"It is to be noted that Eibel's one object was to arrange a process by which the machine could be run at a much higher speed than heretofore." 267 Fed. 855.

But Eibel claims gravity as a speed producer only when applied through pitch.

For present purposes, the computations in this table, which were elaborately illustrated by charts put in evidence through the defendant's experts, are undisputed. The differences in the methods used by the plaintiff's and the defendant's experts in applying the tables found in engineers' books of recognized authority are negligible. It follows irrefutably that, for most purposes now under discussion, head and pitch are interchangeable methods of applying the same force, viz. gravity as a speed producer on the liquid stock upon the wire screen. It also follows, and is admitted by the plaintiff, that all of the pitches used by the defendant or by the licensees under the plaintiff's patent fell far short of eliminating drag as a speed-producing factor. Indeed, in the uses complained of by the plaintiff as infringing, drag remains a force nearly equal to, if not greater than, gravity due to pitch as a speed producer.

While there are trifling conflicts in the evidence as to the adjustment and operation of the defendant's alleged infringing machines, the present point may be sufficiently illustrated by assuming that these machines were adjusted and operated in accordance with the plaintiff's testimony, with a 7-inch head, a 14 to 15 inch pitch; that the speed of the wire was 550 feet per minute; that the speed equality between the wire and

stock was reached at the normal point 9–10 feet from the slice. So operated, the expert testimony shows the following results:

```
Total velocity of wire.......................................550 feet
Velocity of stock due to head ...............................350  "
Additional velocity due to pitch.............................130  "
Balance of velocity due to drag .............................70   "
Percentage of total velocity due to pitch about ............. 24
Percentage of velocity due to head .......................... 63
Percentage of velocity due to drag .......................... 13
```

If we consider defendant's machines as operated according to the defendant's testimony, at a speed of 585 feet, with 6-inch head and a pitch of 13½ inches, we get the following:

```
Velocity of wire, ...........................................585 feet
Velocity due to head, .......................................330  "
Additional velocity due to pitch ............................118  "
Balance of velocity due to drag of wire......................137  "
Percentage of total velocity due to pitch, about ...........20+  .
Percentage of velocity due to head...........................56.6
Percentage of velocity due to drag...........................23+
```

On this showing, even if the patent is valid, there is no infringement, except on the theory that the patent covers any substantial use of pitch to decrease the drag on the wire. If the patent means, as the Court of Appeals for the Second Circuit apparently held in the Remington-Martin Case, 234 Fed. 624, 148 C. C. A. 390, that pitch adequate to bring the stock to speed equality is Eibel, there is no infringement. It would take a 48-inch pitch with a 2-inch head to relieve the wire of all drag. Even if the patent means that pitch must be the predominating force, there is no infringement; the defendant's predominating force is head.

The question of the amount of pitch covered by the Eibel patent is no mere academic problem. It is vital, and of money importance in this litigation. No decree for an accounting adequate to guide a master can be framed without deciding whether a 6-inch pitch is Eibel's or the public's. After the filing of the bill on January 1, 1917, defendant reduced the pitch on its No. 2 machine from 14 or 16 inches to 6 or 6½ inches, and has so operated it during most of these four intervening years. Judge Hale, at the suggestion of plaintiff's counsel, did not decide whether or not the use of the smaller pitch in the No. 2 machine is or is not an infringement. 267 Fed. 855. But it must be determined in this case whether such use is an infringement—to be paid for—or the use of a common right. Plaintiff's contention that this pitch "is fairly close to the border line" and that the defendant "could have avoided any possibility of infringement by putting the wire flat" is unsound. Defendant was not required to avoid mere possibilities of infringement; it was entitled to all uses of its own machine not particularly pointed out and distinctly claimed in Eibel's patent. It will not do to assert, as plaintiff does, that 12-inch pitches are substantial, and that 3 or 4 inch pitches (prior art) are negligible, leaving intervening pitches in limbo; a line must be drawn available practically, if not mathematically. This case is thus plainly distinguished from such

cases as Vacuum Cleaner Co. v. A. Rot. Valve Co. (D. C.) 227 Fed. 998, and 239 Fed. 544, 152 C. C. A. 421, and Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968, and other cases cited by plaintiff on the question of indefiniteness; in all those cases a practically definite limit was stated. In the Eibel patent we find no such limit.

The position learned counsel for the plaintiff are forced to take on this point but illustrates in striking form the otherwise perfectly clear proposition that the Eibel patent is nothing but an attempt to monopolize a difference in degree; that it is only a claim of an improvement in the method of adjusting and operating the machine so indefinite that its own proponents cannot state its limit.

The defendant's experiment in operating this No. 2 machine with the pitch reduced from 14 or 16 inches to 6 or 6½ inches further illustrates the fact that the whole problem is not only one of degree, but of constant adjustment of the operating forces in the machine to different qualities of stock. It appears that this No. 2 machine, operated for a long period with a 6-inch pitch, has produced substantially as much paper, of a stronger fabric, and with less operating trouble, than its duplicate No. 1 machine with about a 13½-inch pitch. The evidence does indicate that the paper produced on the No. 2 machine looks a little "wilder"; but, tested by the tests alleged to be more important, it is contended to be at least as good paper as that produced on the No. 1 machine. Both machines were operated with substantially the same head, although at times the head of the No. 2 machine is said to have been a little higher.

In the light of this evidence, we find it impossible to hold that the difference between a 6-inch pitch and a 14 to 16 inch pitch causes, other operating conditions being perhaps slightly varied, the production of anything other than a slight difference in the look or quality of the paper. At any rate, it does not clearly appear that the additional pitch of 6 or 7 inches, contended by the plaintiff to be a substantial pitch, is an important, or even material, factor in enabling the machine to be operated at a greater speed or with the production of a superior quality of paper.

But whether a pitch of 14 inches does or does not produce more or better paper than a pitch of 6 inches, we think it clear that paper makers are entitled to interchange pitch with head or with drag, and to vary pitch or head in accordance with such judgment as, dealing with any quality of stock or any capacity of machine, they form, through the experimental processes constantly used by operators, in so adjusting their machinery as to produce the largest amount and the highest quality of paper.

We have not found it necessary to review in detail the great mass of evidence concerning prior uses, for, in the view we take of the case, the plaintiff's own admissions as to the nature and extent of 4 or 5 inch prior uses conclude the point in the defendant's favor.

Plaintiff's expert testifies that he hardly thinks—

"that 4 inches could be considered as a substantial pitch. Q. Why not? A. Because Eibel in his specification attempts to differentiate the pitch he has in mind from what had been previously used when he specified that it is to be substantial."

We cannot accept the theory underlying this testimony. It amounts to saying that a 5-inch pitch is not "substantial," merely because the witness had discovered that 4-inch pitches had been in common use before Eibel. But it is plain that the difference between no pitch and a 4-inch pitch is as great as the difference between a 4-inch pitch and an 8-inch pitch.

The plaintiff suggests, not apparently with much confidence, that this court ought to follow the decision of the Court of Appeals for the Second Circuit in the Remington-Martin Case, 234 Fed. 624, 148 C. C. A. 390. We recognize fully the great weight which attaches to a decision by that learned court, and the importance of the principle that there ought not to be conflicting decisions by different Courts of Appeal relative to the validity of the same patent. Nevertheless, the record before us is so different from that which was before the court in the Second Circuit that we do not think that we can properly follow that decision. It is our duty to decide the issues of law and fact as presented by this record. There is before us a large mass of convincing evidence as to prior use which was not in the Remington-Martin suit. We also have the assistance of elaborate expert testimony, illuminating some vital aspects of the problem, not put before that court. The defendant produced no experts in the Remington-Martin Case. The court was therefore left to accept the theories of plaintiff's expert.

We must limit ourselves to generalizations; an elaborate and detailed comparison of the two records would unduly prolong a discussion already sufficiently extended. It may, however, be appropriately noted that the defendant contends, not without plausibility, that the decision of the Court of Appeals for the Second Circuit, construed in connection with the record now before this court, makes that decision an authority for the defendant and not for the plaintiff.

It seems to be clear from Judge Mayer's opinion (234 Fed. 624, 148 C. C. A. 390) that infringement was not contested in that court. The defendant in that court apparently relied upon the finding as to prior use by Judge Ray in the District Court, 226 Fed. 772, as follows:

"In short, I find from the testimony, which is not impeached, or discredited, or really contradicted, that everything this defendant is doing was done, and well known and understood with many paper makers, before Eibel's alleged date of invention."

The defendant now contends that the conclusion of the court above, reversing Judge Ray, is grounded on a misapprehension as to the date concerning which one or more of the defendant's witnesses was testifying as to paper-making conditions. However, that may be, it is clear that there is nowhere in the opinion of Judge Mayer any discussion of the importance of drawing a sharp line between the degrees of pitch shown in the prior art and that which is alleged to be covered by the Eibel invention. On the contrary, that court says:

"The pitch of the wire and the wire speed must be so correlated that gravity *will accelerate the stock to speed equality with the wire.*" (Italics ours.)

This language construed in connection with the context shows that the court was referring to speed equality due to pitch and not to head. The statement, therefore, is at least not inconsistent with the defendant's contention that that court construed the claims as calling for an amount of pitch which would eliminate drag. If such be the meaning of that opinion, then, as the evidence before us shows conclusively that none of the pitches used by either plaintiff or defendant even approximate an elimination of drag as a speed-producing force, it becomes apparent that the view of that court is, on the essence of the problem, not inconsistent with the conclusion to which we have come.

The fact that Judge Ray, on a record dealing much less adequately with prior use than does the record before us, reached the same conclusion that we have reached on that point, is not without significance.

Our general views as to the indefiniteness of the claims are also accordant with those expressed by the English court. European Eibel Co. v. Lloyd, The Illustrated Official Journal, vol. 28, June 21, 1911.

It is thus apparent that prior decisions, fairly analyzed and construed in the light of the record before us, offer no support to the plaintiff's contention. If they make either way, they make for the defendant.

Again, the plaintiff urges here the consideration given great weight in the Remington-Martin Case, as well as by the District Court in this case, the alleged commercial success of the Eibel patent.

It is contended that Eibel's invention was at once adopted by substantially the whole art; that, using it, Fourdrinier machines have been able to increase their speed from 25 per cent. to 30 per cent.; that at the time of the trial of this case machines licensed under the Eibel patent were producing daily about 3,400 tons, or substantially two-thirds of all the news print manufactured in the country.

We recognize, of course, the importance of practical commercial success in cases in which that principle may be properly invoked. It has been termed a "hazardous rule." Nat. Sweeper Co. v. Bissell, etc., Co., 249 Fed. 196, 161 C. C. A. 232; Nat. Machine Corp. v. Benthall Co., 241 Fed. 72, 154 C. C. A. 72; Harvey Hubbell, Inc., v. Gen. Elec. Co. (C. C. A.) 267 Fed. 564. It is no safe criterion of patentable novelty. McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800.

But the plaintiff has, perhaps not unnaturally, very much exaggerated this aspect of the record. It appears that of the licensees producing 3,400 tons a day, five of the largest, having a daily production of about 2,200 tons a day, are stockholders in the plaintiff company. It is obvious that to the extent that they are such stockholders their royalties are but payments to themselves. It is also clear that, with the prestige which would result from the ownership and use of this patent by five leading paper concerns, commercial success with other manufacturers would be almost assured. Compare Harvey Hubbell, Inc., v. Gen. Elec. Co., supra. On this showing, which we infer was not before the court

in the Remington-Martin Case, no very great weight can be attached to the extent of the commercial use attained.

As to plaintiff's contention that Eibel's invention has increased the average speed of Fourdrinier machines 25 per cent. to 30 per cent., we think this claim is not borne out on fair analysis of the whole record. Undoubtedly, since 1907 there has been a considerable increase in the average speed attained by Fourdrinier machines. The record as a whole warrants the contention that some part of that increase is due to the adoption of increased pitch, and that Eibel's disclosure of the advantages of increased pitches has had some practical and beneficial effect in the art of paper making. But pitch is only one factor leading to this result. The fair inference from the record is that increased heads have also become common during the same period; that the machinery manufacturers are putting out heavier machines, capable of standing higher power and increased speed; that careful study has been made of the quality of the stock, and improvements made in adapting the quality of the stock to more rapid movement. In a word, the art has progressed. An increased pitch—the factor stressed by Eibel—is only one of the large number of factors tending to increased output, without serious impairment of quality. Paper makers must always struggle with variable elements; they must have freedom in adjusting their machines as skill and experience direct.

The plaintiff seeks to avoid the effect of the admitted prior use of pitches, which we must and do find to have been substantial, by contending that such pitches were adopted for drainage purposes only; that they were applied in ignorance of the alleged new principle discovered by Eibel. So contending, plaintiff's argument falls little short of claiming an absolute monopoly for Eibel of the use of gravity through pitch. But long before Eibel people knew that water would run down hill and that the steeper the hill the faster the water would run. Moreover, drainage depends in part upon speed, and paper makers must have observed the relation, whether running the stock uphill or downhill.

[3] The plaintiff invokes the doctrine that accidental and unappreciated results and functions in prior uses are not anticipation, citing as the leading case on this point Tilghman v. Proctor, 102 U. S. 707, 711, 26 L. Ed. 279. Other cases cited are: Tannage Patent Co. v. Donallan (C. C.) 93 Fed. 811; Hillard v. Fisher Book Typewriter Co., 159 Fed. 439, 441, 86 C. C. A. 469; Pittsburgh Reduction Co. v. Cowles Electric Co. (C. C.) 55 Fed. 301, 307; Wickelman v. A. B. Dick Co., 88 Fed. 264, 266, 31 C. C. A. 530; Anthracite Separator Co. v. Pollock (C. C.) 175 Fed. 108, 111; Taylor Burner Co. v. Diamond (C. C.) 72 Fed. 182, 185; Byerley v. Barber Asphalt Paving Co. (D. C.) 230 Fed. 995, 997; German-American Filter Co. v. Erdrich (C. C.) 98 Fed. 300; Pittsburgh, etc., Co. v. Seaman-Sleeth Co., 248 Fed. 705, 709, 160 C. C. A. 605.

Accepting fully the doctrine, we think it is not applicable to the situation here disclosed. Plaintiff's own expert admits that "the effect of gravity was always there, regardless of how small the pitch was."

Compare Brown v. Piper, 91 U. S. 37, 41, 23 L. Ed. 200; Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 555, 18 Sup. Ct. 707, 42 L. Ed. 1136; Risdon Iron Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899.

It is incredible that a skillful operator of one of these great machines would have used a 3 or 4 inch pitch, with or without a substantial head, without paying some attention to the increased speed of the stock thereby induced. We agree with the contention of defendant's counsel that intelligent men in charge of such a machine could not operate it without discovering that commotion, ripples, and "wildness" in the paper would result, if the wire traveled at a speed relatively much faster than the speed attained by the stock through head and pitch, one or both. But the direct and affirmative evidence shows that there was prior appreciation of the principle which Eibel now claims as his own discovery.

Patentees frequently obtain advantages in their patents which they did not discover. The principle applies to prior art uses. Compare New York Scaffolding Co. v. Chain Belt Co., 254 U. S. 32, 37, 41 Sup. Ct. 21, 23, 65 L. Ed. ——, where Mr. Justice McKenna said:

"We yield to the assertion of counsel that he [the patentee of the patent in suit] cannot be deprived of an advantage because he did not discern it, but the same concession must be given to Murray [a prior patentee]. He [Murray] was entitled to all of the benefit that he claimed for his device, *or that can be given to it by formal changes.*" (Italics ours.)

See, also, Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 12 Sup. Ct. 601, 36 L. Ed. 327; Penn. R. R. v. Truck Co., 110 U. S. 490, 4 Sup. Ct. 220, 28 L. Ed. 222; Blake v. San Francisco, 113 U. S. 679, 5 Sup. Ct. 692, 28 L. Ed. 1070.

It is true that to change the pitch of the machine was a somewhat troublesome and cumbrous undertaking, such that an operator would not as matter of common and daily occurrence experiment with varying pitches; but it is also true, as pointed out above, that head was, for most purposes sought to be attained by the alleged Eibel invention, the equivalent of pitch, and that the record shows that operators were frequently experimenting with different heads. They must, therefore, have observed the action of the stock on the wire at different rates of gravity-induced speed.

Even if, as the plaintiff contends, gravity applied through pitch gives a smoother and more even movement, and thus produces a better quality of paper, than when applied by head, yet, so far as relative velocity with the movement of the wire is concerned, the results would be the same. At most, the distinction between a head-induced speed and a pitch-induced speed was one of slight degree in the amount of commotion arising in the flowing and draining stock.

Besides, as already sufficiently indicated, Eibel does not claim a patent on the distinction between pitch-induced speed and head-induced speed. He ignores the existence of head-induced speed.

Summarizing our conclusions: If we construe the language of the patent according to its natural import, as claiming pitch sufficient to

eliminate drag, there was no useful invention, and no infringement, even if there was invention; if we construe the claims as plaintiff would have them construed, they cover merely a degree, and are void for indefiniteness.

The result is that the decree below must be reversed, the money paid the plaintiff pendente lite must be repaid, and the bill dismissed, with costs to the defendant in this court.

It is ordered that the money paid by the appellant to the appellee pendente lite under order of this court of May 28, 1917, be repaid by the appellee to the appellant; the decree of the District Court is reversed, and the case is remanded to that court, with directions to enter a decree dismissing the bill, with costs; and the appellant recovers its costs of appeal from both the interlocutory and the final decrees.

4. **Municipal corporations ⊂⟞623(2)—Portion of cost may be assessed against specially benefited property owned by city and not devoted to public use.**
   Under Rev. Laws Mass. c. 75, §§ 75–84, relative to the abatement of certain nuisances, an assessment of benefits may be made against specially benefited property owned by the city and not devoted to public uses.

---

⊂⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes