## FLINTKOTE CO. v. NATIONAL ASBESTOS MFG. CO.

District Court, D. New Jersey. November 23, 1929.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds, of New York City, of counsel), for plaintiff.

Dean, Fairbank, Obrieght & Hirsch, of New York City (Clair W. Fairbank and Irving M. Obrieght, both of New York City, of counsel), for defendant.

RUNYON, District Judge. The plaintiff herein is the owner of two patents, the first one, No. 908,125, granted December 29, 1908, known as the Overbury patent, and the second, No. 1,410,018, granted March 21, 1922, and known as the Kiracofe patent, and the issues of validity and infringement of both patents are here involved, inasmuch as the machine used by defendant, it is claimed, infringes the Kiracofe patent, while the product thereof is alleged to infringe the Overbury patent.

These patents relate to the roofing industry, and to that phase thereof which deals with the manufacture of so-called strip shingles, consisting of long strips of a composite material, so treated as to withstand weather conditions, and cut at regular intervals in such fashion as to give the appearance of a series of individual shingles, when these strips are laid along a roof in rows, each row partially imposed upon the row beneath it.

In or about the year 1907, when the Over-

bury patent made its appearance, the principal form of prepared or artificial roofing, as distinguished from wood, slate, or tin, came in long rolls of specially treated paper or felt, and these rolls were laid in successive rows, each one partially covered by the overlapping of the next higher row, and the overlapping edges held together either by cement or nails.

The Overbury aim, in part, at least, seems to have been to provide artificial roofing which should have more durability and more attractiveness than had theretofore been evolved, and to that end offered several inventions, one of which contemplated a roll of roofing material, straight on each lengthwise edge, but cut lengthwise along the approximate center of the roll, in half-diamond design.

This operation purposed as a result two rolls, each one-half as broad as the original roll, and susceptible of being superimposed one upon the other in such form as to produce a full diamond design. This, together with the furnishing of the rolls in different colors, contemplated a form of roofing calculated to interest a public concerned with the roofing of residences and public buildings.

To this new style of roofing, plaintiff, in its exploitation thereof, gave the name of zolium, and, while the product developed many shortcomings, it attained a market of considerable size. While there had been other patents granted for prepared roofing, there were none, apparently, which had been able to meet commercial demands, or which were being sold in the open market. In consequence, the only two forms in which prepared roofing appeared in or about 1907 in any practical commercial sense were as the long uncut roll and as the so-called zolium.

It was during this period that one of the patents in suit, Overbury, No. 908,125, made its appearance, proposing a new form of roofing element, to consist of a square-butt strip shingle, accomplished by cutting lengthwise in a web of flexible waterproof material a series of slots arranged in line, and then cutting the web along a line intersecting the slots of the series, thus forming two strip shingles from the web, each having notches at intervals along one edge, formed by slots cut in the web. The strip, when laid in place, gave the appearance of several individual shingles secured together with spaces between the butts.

While the foregoing is apparently the product which Mr. Overbury had in mind, a reading of the claims of patent No. 908,125 discloses the fact that the claims fall far short

of embracing such result. The two claims in question are as follows:

"1. A shingle strip blank composed of an elongated sheet of flexible waterproof material, having transverse slots between its edges, the ends of the slots being between the edges of the sheet, so that said edges are continuous, said blank being adapted to be converted into two operative shingle strips by severing it lengthwise between the ends of the slots.

"2. A shingle strip blank of indeterminate length composed of an elongated sheet of flexible waterproof material, having transverse slots between its edges, the ends of the slots being between the edges of the sheet so that said edges are continuous, said blank being adapted to be converted into two operative shingle strips of either the full length of the blank or of lesser length by severing it lengthwise between the ends of the slots."

The file wrapper shows that Overbury, in his original application for the patent in suit, claimed his invention as an improvement in "roofing members and method of making the same." This application is shown to have contained four claims, three of which, speaking in general terms, were for the roofing member, while the fourth was for the method of making such member.

In the opinion of the Examiner, the first three claims failed to define any invention which could properly be covered by a mechanical patent, while claim No. 4, drawn to cover the method, was for another invention altogether from that embraced in the first three claims. He therefore rejected the first three claims, and deferred action on the merits until the application should be limited to one invention.

Following this, Overbury rewrote his specifications, canceled his original claims, and put forward two new ones, the first for the method and the second for a blank. The Examiner later rejected both of these claims, whereupon Overbury accepted the ruling as to the method claim, filed an amendment canceling this claim and leaving the claim regarding the blank, which is claim No. 1 of the patent in suit.

The Examiner proceeded to reject this claim again, and Overbury thereupon added another claim, being the present claim No. 2, which the Examiner refused to recognize as valid, claiming that it was substantially the same as claim No. 1. On an appeal taken by Overbury from the Examiner's rejection to the Board of Examiners in Chief, the Examiner was reversed, and the two claims of the patent as issued were allowed.

The above record has been set forth with some particularity, as showing the scope of the original specification and claims, the surrender and cancellation of various claims having to do with the shingle strip and method, and the claims set forth in the patent as issued, and dealing solely with the blank. From this history there is but one reasonable deduction to be drawn, viz. that the patent in suit must be interpreted as limited to a blank, possessing no utility within itself, except as it may be altered to form something else, which is not covered by the patent.

"The patent to Adams stated its claim thus: 'What I do claim (as a new article of manufacture) is a tube or cylinder cast out of copper and free from blow holes and other similar defects when produced as herein stated.' We assume that Adams had invented a new and valuable process, which it is unnecessary to describe, but by which he produced a much larger percentage of sound copper tubes than it had been possible to produce before. But he took his patent for the product, and he must stand upon his claim as it was made." American Tube Works v. Bridgewater Iron Co. (C. C. A.) 132 F. 16, 17. See, also, Knight Soda Fountain Co. v. Walrus Mfg. Co. (C. C. A.) 258 F. 929, 931.

In the case of Yates v. Smith et al., 271 F. 33, at page 35, Judge Buffington, speaking for our own Circuit Court of Appeals, said in part:

"We are not concerned with the question whether this action of the department was right (Vanmanen v. Leonard, 248 F. 939, 161 C. C. A. 57), or whether Bogenberger, by contesting, could justly have obtained a broader claim. The decisive thing is that, whatever contention to the contrary Bogenberger might have made, he did not make it, but himself became the actor, and tendered and accepted claims which restricted him to location limits, namely, on the frame of the window. Such being the condition of claim limitation and the consideration for which his patent issued, it follows that this location limit must be enforced, when he attempts on patent enforcement to expand his claims by emasculating such enforced limitation. For this court to adjudge otherwise would be for us to now in effect, and under the guise of mechanical equivalents, undo the action of the Patent Office and close to the public a field of manufacture which Bogenberger disclaimed, and which the Patent Office forced him to make as a condition of securing his claim."

"We find no case which flatly holds that

74

a patentee who, in his specification and claims, refers to a machine, and nowhere claims a patent on a process, has been held entitled to have his patent construed as covering a process." Minnesota & Ontario Paper Co. v. Eibel Process Co. (C. C. A.) 274 F. 540, 546.

Overbury's original ideas, as shown both in specification and claims, were much broader than in the patent as finally issued, and it was only when he rewrote his specifications that the word "blank" first occurred, together with a recital of its alleged utility. But from the first alteration there continues to appear a constant narrowing in the scope of his claims, until the final ones appear to deal solely with the blank. Under these conditions, which seemingly are determinative, the patent in suit must be declared void for lack of utility.

The second of the two patents in suit is No. 1,410,018, issued to the plaintiff in the name of O. P. Kiracofe, and relates· to a machine for cutting slots in the web, after which slot cutting the web is cut in order to furnish the shingle strip. This shingle·strip has as its basic material raw felt, and this felt is impregnated and coated with asphalt, and then surfaced with ground slate.

With the development of this type of shingle strip, many difficulties presented themselves in producing accurate and workmanlike results. These troubles in the main had to do with the unusual character of the basic material, and the difficulty attendant upon cutting pieces from a web of asphalted felt while the same was going at high speed.

The raw felt in the first place was a loosely matted, fibrous sheet, light in weight and lacking any great mechanical strength, but with the impregnation and coating of asphalt this sheet became palpably heavier, approximately doubled in thickness, and acquired a strength four or five times its original volume. The rectangular pieces necessary to be cut from the web had to be cut sharply, with clean edges and corners; had to be cut when the web was moving at high speed, and at a time when the web was at such a temperature that the asphalt coating presented a gummy or sticky rubberlike surface. In addition to the foregoing, the knife employed in the cutting soon became coated with asphalt and web fibers to such an extent that the making of a clean hole was practically an impossibility, after a short time, and when the knife became dull all these difficulties increased.

Another problem was the disposition of the cut-out pieces. In the absence of adequate removal agencies, and in view of the gummy substance of the strip, it is easy to conceive how frequently one of these cut-out pieces, although cut from the main web, might still adhere to it and be carried along with it, either in its original position, or lifted out of such original position and dropped on the surface of the web, in which latter event defacement ensued in the case of any portion of the web with which these vagrant cut-outs came in contact.

It was apparently to meet this situation, which had enlisted the inventive talent of several prior patentees, who had but partially solved the problem, that Kiracofe comes into the picture. His idea of the situation, and of the means to meet its demands, consisted of cutting out these rectangular pieces by performing the cutting operation at two separate points or stations, the mechanism at the station making two parallel transverse cuts in the web, and at the second station making two parallel lengthwise cuts, designed to join the ends of the two transverse cuts; a mechanism being further susceptible of arrangement, so that one of the cutting members at the second station could carry the cut-out piece around with it away from the web to a point where it could be disposed of by a stripper.

A review of the prior art, while disclosing many slot-cutting machines, fails to show any one which accomplishes its purpose in the fashion adopted and shown by Kiracofe, viz. through the making of two parallel transverse cuts at one point and two parallel longitudinal cuts at another point, the ends of said pairs of cuts meeting and completing the four-sided incision.

There are numerous patents cited by defendant against the Kiracofe patent, of which eight only refer to machines designed to make roofing elements. Of these, one is the Overbury patent, No. 891,500, which also shows the machine used for making the so-called Zolium, heretofore referred to, and the cutting accomplished by this machine was of a far different nature from that involved in the Kiracofe patent, being only the cutting of a zigzag line in the web. The other seven machines belong to one or the other of three types, viz. either the type shown in the Spiegel patents, Nos. 1,110,133 and 1,301,332, and the Gardner patent, No. 1,191,297, providing for the cutting of slots through the use of male and female dies; or the type shown in the Cunifer patent, No. 1,257,321, and the Wyman patent, No. 1,263,987, char-· acterized by the use of a rectangular cutting die operating against a smooth surfaced roll, the cut-out piece being received into the die and gradually expelled through it. The ideal operation contemplated in these two types

caused the cut-out to pass through one of the dies and be disposed of, but it frequently happened in actual operation that this cut-out was held to the web, either by uncut fibers or by the sticky asphalt, and carried along with it, resulting oftentimes in the disfigurement of the completed web.

The third type of the prior art machines is that shown in the Overbury patents, Nos. 1,182,416 and 1,182,417. In this type dies were provided for cutting three sides of the rectangle of each cut-out, and the transverse cut of the web completed the cutting of the fourth side of the cut-out. In this type, also, the cut-outs were frequently carried along with the web, and, although pins were placed on the holder of the cross-cutting knife in position to strike the cut-outs, there still remained in practice great difficulty in disposing of these separated pieces.

The other patents cited against the Kiracofe patent, while having to do with cutouts, also have to deal with radically different materials of manufacture, and present, in consequence, essentially different problems of disposal of cut-outs. The cutting mechanisms of these machines do not forestall or anticipate those of the Kiracofe patent, and, if applied to a gummy shingle strip moving at high speed, would have proven lamentable failures. It seems very plain from the foregoing that the Kiracofe patent must be accorded validity.

The remaining question is as to whether or not defendant's machine and method are infringements of Kiracofe. As one reads the Kiracofe patent, the restricted scope of its intended range becomes apparent, and this showing is emphasized when it appears, not only that the purpose of the patent was to effect improvement in the machine designed for the making of crosscut strips, but is silent as to showing any capability for cutting other types of strips, either directly or through any modification of the construction permissible within the scope of the invention.

As illustrative of the fact that the patent is intended to serve and is designed to constitute an improvement in the crosscut machine, the following from the specifications is pertinent:

"In making crosscut shingle strips, so called, in which the strips are successively severed from the end of the advancing sheet, it has become customary to cut transverse spaced rows of longitudinal slots in the sheet, and to sever the strips on lines intersecting the slots of each row.

"The formation of such slots produces oblong waste pieces which are apt to be carried along with the sheet and to be mixed with the strips, or to clog the rolls or cutters and halt the operation of the machine."

Further on comes another specification, which emphasizes the fact that it is a crosscut mechanism with which the patent deals. It reads as follows:

"The slot-forming mechanism, which forms a part of the present invention comprises two sets of cutters, one set operating to cut spaced *transverse* cuts or slits in the sheet to form the *ends* of the slots, and the other set operating to cut parallel *longitudinal* slits or cuts in the sheet to form the *sides* of the slots."

Both types of machine, the crosscut and the lengthwise cut varieties, were well known at the time of the Kiracofe patent, and it therefore becomes evident, in view of the language employed under these circumstances, that it was used intentionally, and that by design it was restricted to machines of the crosscut variety.

The claims in various stages confirm this conclusion, as where, for instance, they define the arrangement of cutters as being such that "a series of *longitudinal* slots are formed." Claim 3 goes to a greater and more specific extent, in that it calls for the making of the roofing elements by combining with the specified slot-forming cutters "means for severing said sheet transversely."

This makes it clear that the means for severing limit the claim to a machine of the type in which the strips are cut transversely because in machines of the longitudinal type, such as shown in Spiegel, 1,110,238, Gardner, 1,191,297, and Cunifer & McFarland, 1,257,-321, no means appear for cutting the sheet transversely, while in defendant's machine it is the longitudinal slitters which form the shingle strips or roofing elements, and not the transverse cutting means.

The mechanism for forming the transverse slits is described in the specification as blades *39*, each of which has "a sharp chisel edge, the straight edge of which is radial to the shaft." These coact with shear edges *43* of the other cutter head.

The patentee, after describing the cutter head on shaft *31*, refers to "the coacting cutter head," and further says that the shear edges *43* are for coaction with the blades *39*. These two blades *39* do not coact to form the end slits for a slot, but each blade *39* coacts with the shear edge *43*, making the movement of the blades *39* past the shear edges *43* a shearing action. The parts *39* and *43* act as the blades of the shear and constitute the coacting cutters.

In this connection it may be said that

every claim in the Kiracofe patent is limited to a pair or pairs of "coacting cutters" for forming the transverse slits. This term, as used in all the claims, limits the patent to cutters operating on the shear principle, in which there are blades or cutters which coact.

These coacting cutters do not appear in the defendant's machine. The cutters on defendant's machine, designed for making the transverse slits, are on the lower cutter head, while the upper smooth cylinder serves as a platen, and thus does away with any movement resembling a shearing operation.

Claims 2 and 4 of the Kiracofe patent call for "means for stripping the waste pieces or cuttings from the second series of pairs of cutters." In defendant's machine the cut-outs are not stripped from any cutters, but from pins, and it is the pins, instead of the cutters, which carry away the waste pieces.

Inasmuch as every claim of the patent is limited to a construction wherein the transverse slits are formed by coacting cutters, that is to say, shear cutters, and as claims 2 and 4 are additionally limited to a type of cut-out remover which defendant does not employ, these further differences furnish additional proof of freedom from infringement.

Indeed, and in conclusion, a reading of the entire set of specifications and claims shows, in the first place, that they were directed definitely and specifically to machines of the crosscut type. And, with such further differences as are therein shown, the situation may be summed up by saying that, inasmuch as the defendant's machine cuts the strips lengthwise, and not crosswise, as does the plaintiff's, and does not form longitudinal slots, as does the plaintiff's, and does not include a type of cutter which can be used with the crosscut strip, as does the plaintiff's, and utilizes pins, expedients only though they be, rather than cutters, for the removal of the cut-outs from the sheet, and strips these cut-outs from pins rather than from cutters, there is clearly such a difference in principle construction and method between the two machines as to avoid any charge of infringement.

These conclusions appear inevitable in the light of any reasonable reading of the claim and specifications, which in their limitations bear the evidence of deliberate design. Having elected and set limitations to the field intended to be covered by the patent grant, there can be no protection afforded beyond the limits.

"The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. These so mark where the progress claimed by the patent begins and where it ends that they have been aptly likened to the description in a deed, which sets the bounds to the grant which it contains. It is to the claims of every patent, therefore, that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for by the statute,—'He can claim nothing beyond them.'" Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U. S. 502, 37 S. Ct. 416, 418, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959.

A decree in accordance with the foregoing may be presented.